EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* LEÓN RÍOS MEDINA, acusado y apelante.

No. 2253.—*Visto:* Marzo 11, 1925. *Resuelto:* Julio 24, 1925.

1. HOMICIDIO—"INDICTMENT" Y ACUSACIÓN—ACUSACIÓN SUFICIENTE—MUERTE A CONSECUENCIA DE HERIDAS.—Una acusación por asesinato no. es fatalmente defectuosa porque no consigne de modo expreso que la muerte se debió a la herida inferida por el acusado al interfecto, cuando establece base suficiente para probar el *corpus delicti* en el acto del juicio.

2. DERECHO PENAL—"VENUE"—CAMBIO DE LUGAR DEL JUICIO—IMPOSIBILIDAD DE OBTENER UN JURADO IMPARCIAL.—No demostrándose, al solicitar el traslado basado en la imposibilidad de obtener un jurado imparcial en el distrito que tal imposibilidad existiera, y apareciendo por el contrario que pudo seleccionarse uno sin dificultad, no cabe sostener que la corte abusó de su discreción al denegar la solicitud.

3. TESTIGOS—COMPETENCIA—CAPACIDAD Y CONDICIONES EN GENERAL—MENORES—OBJECIÓN TARDÍA.—Cuando la solicitud para que se elimine la declaración de un menor—por no haberse investigado previamente su capacidad para declarar—se presenta después que dicho testigo ha terminado su declaración, es tardía. La declaración en sí misma proporciona a la corte base para juzgar la capacidad del testigo.

4. TESTIGOS—CREDIBILIDAD, IMPUGNACIÓN, CONTRADICCIÓN Y CORROBORACIÓN—IMPUGNACIÓN DEL PROPIO TESTIGO—ALEGACIÓN DE SORPRESA COMO BASE.—Un fiscal que se ve sorprendido por la declaración de un testigo de cargo, puede interrogarle respecto a manifestaciones hechas por él ante el juez instructor y el propio fiscal a fin de impugnar su testimonio.

5. DERECHO PENAL—EVIDENCIA—HECHOS EN "ISSUE" Y PERTINENTES A ÉSTOS, Y RES GESTAE—PRUEBA SOBRE LA CAUSA QUE PRODUJO LA MUERTE.—En un

proceso por asesinato, es admisible la declaración de un médico respecto a la causa que produjo la muerte cuando los hechos expresados en la acusación establecen base necesaria para probar ese elemento del *corpus delicti*.

6. Derecho Penal—Evidencia—Prueba Pericial—Armas de Fuego.—No constituye error el que un perito médico en el curso de su declaración manifestara que le habían presentado un revólver y contestando a un jurado, diga que la bala que había extraído del cerebro del interfecto era de determinado calibre de acuerdo con su propia observación y la del jefe de policía que se hallaba presente, especialmente en ausencia de una objeción específica.

7. Derecho Penal—Apelación y Error, y Certiorari—Revisión—Errores que no son Perjudiciales—Manifestaciones del Fiscal.—Cuando un fiscal, en sus manifestaciones durante el juicio, no termina su pensamiento en cuanto a su opinión respecto a la culpabilidad del acusado y la corte ordena su eliminación inmediatamente, el error, si alguno hay, no es perjudicial, y menos, cuando las instrucciones trasmitidas al jurado dejan las cosas en su verdadero lugar.

8. Testigos—Competencia—Capacidad y Condiciones en General—Declaraciones de Marido o Mujer en Procesos Criminales Contra Uno de Ellos.—Presentada la esposa de un acusado como testigo de la defensa, el fiscal tiene derecho a averiguar, por contra-interrogatorio, hechos envueltos en el interrogatorio directo y a aquilatar la veracidad de la testigo.

9. Derecho Penal—Apelación y Error, y Certiorari—Autos y Procedimientos que no Están en Récord—Cuestiones a Revisar.—No procede discutir un error alegado cuando de las constancias en récord no hay base para discutirlo.

10. Derecho Penal—Evidencia—Preguntas a los Jurados Antes de Constituirlo.—Las preguntas a los jurados antes de constituir el tribunal de hecho, no forman parte de la prueba del juicio.

Sentencia de *Tomás Bryan, J.* (Aguadilla), condenando al acusado por delito de homicidio voluntario. *Confirmada.*

*García Méndez & García Méndez,* abogados del acusado; *José E. Figueras,* abogado de *El Pueblo,* apelado.

El Juez Presidente Señor del Toro, emitió la opinión del tribunal.

León Ríos Medina fué acusado de asesinato y condenado como autor de un delito de homicidio voluntario. No conforme con la sentencia apeló, señalando en su alegato diez y siete errores.

[1] En lo pertinente, dice la acusación así:

"El referido acusado, León Ríos Medina, en época anterior a la presentación de esta acusación, o sea allá por uno de los días del mes de diciembre del año 1922, en el Bo. Piedras Blancas, de San Sebastián, P. R., que forma parte del Distrito Judicial de Aguadilla,

P. R., allí y entonces, ilegal, voluntaria y criminalmente, con malicia tácita y premeditada dió muerte ilegal al sér humano nombrado Domingo Soler, al cual le hizo un disparo con un revólver que le causó una herida penetrante en el cráneo que le atravesó de atrás adelante, horizontalmente, todo el hemisferio cerebral izquierdo al nivel de la circunvolución del cuerpo calloso yendo a alojarse entre la ·dura-mater y el frontal, falleciendo el ya mencionado Domingo Soler, momentos después de recibir dicha herida y la cual le fué inferida por León Ríos Medina, al hoy interfecto Domingo Soler con intención de matarlo y sin mediar notable provocación.''

Se alega que la anterior acusación es fatalmente defectuosa porque no expresa ''que la muerte del interfecto se debió a la herida que se dice le produjo el acusado.'' Se invoca el caso de *El Pueblo* v. *Matos,* 26 D.P.R. 586, en el que esta corte resolvió que:

''El hecho de la muerte y la causa que la produce son los únicos elementos que constituyen el *corpus delicti.* Y para que una persona pueda ser declarada culpable de un delito deben probarse esos dos elementos del *corpus delicti* y después, que el acusado es la persona que lo cometió.''

Expresa la acusación que el acusado dió muerte ilegal a Domingo Soler haciéndole un disparo de revólver que le causó una herida penetrante en el cráneo, falleciendo Soler momentos después de recibir la herida que le fué inferida por el acusado con la intención de matarlo, y ello es bastante porque establece la base necesaria para probar el *corpus delicti* en el acto del juicio. Es para la evidencia demostrar cumplidamente que la muerte fué la consecuencia necesaria del acto criminal del acusado. No existe, pues, el primero de los errores señalados.

[2] Tampoco el segundo. Hemos analizado la solicitud de traslado y las pruebas aportadas, consistentes únicamente en affidavits, y opinamos que la corte de distrito estuvo justificada al declararla sin lugar. No se demostró en la forma que la jurisprudencia exige que fuera imposible la obtención de un jurado imparcial en el distrito. Al contrario los

hechos demostraron luego que pudo seleccionarse un jurado sin dificultad.

En el caso de *People* v. *Congleton,* 44 Cal. 93, la Corte Suprema del estado se expresó así:

"La única otra cuestión descansa sobre la denegación de la moción hecha por el prisionero para trasladar el caso del Condado de Humboldt, donde la acusación fué presentada, bajo el fundamento de que un juicio justo e imparcial no podía allí obtenerse. El estatuto establece que si la corte se convence de que un juicio justo no puede obtenerse ordenará que el caso sea trasladado a otro condado libre de tal objeción. La concesión o denegación de una solicitud para cambiar el lugar del juicio en un caso criminal se ha sostenido siempre que es discrecional en la corte—la moción está dirigida a la sana discreción de la corte para ser resuelta de acuerdo con los sanos principios de justicia.—(People vs. Fisher, 6 Cal. 154.)

"En este caso los affidavits bajo los cuales la moción estaba concebida eran exageradamente no satisfactorios. Ellos en lo esencial establecían que en la creencia y opinión de los declarantes el prisionero no podía obtener un juicio imparcial debido a prejuicio popular en su contra. Aparece también que ninguna dificultad hubo en obtener un jurado libre en absoluto de prejuicios contra el acusado, y bajo estas circunstancias nosotros no podemos decir que la corte abusara de su discreción al denegar la moción."

Esta Corte Suprema ha considerado en repetidos casos las circunstancias que deben mediar para la concesión de traslados. Ultimamente la cuestión se estudió con cierta amplitud en el caso de *El Pueblo* v. *Collazo,* 33 D.P.R. 49, procedente también del distrito de Aguadilla y en el que se alegó la misma causa que en éste para solicitar el traslado.

[3] Los errores 3, 4 y 5 se señalan del siguiente modo:

"3. Erró la corte inferior al permitir al Fiscal preguntar a la testigo Ramona Irizarry que declarase si después de oir el disparo había visto a su abuelito el acusado.

"4. Erró la corte inferior al sostener la pregunta del Fiscal a la testigo Ramona Irizarry para que dicha testigo declarase si después de haber venido su madrina el acusado se había quedado en la hamaca.

"5. Erró la corte inferior al denegar la eliminación de la declaración de Ramona Irizarry."

Los hechos ocurrieron así:

"Declaración de Ramona Irizarry.—Comparece esta testigo y bajo juramento y a las preguntas del Hon. Fiscal, contesta: que se llama Ramona Irizarry; que tiene doce años, entrada en trece, y vive en el pueblo de San Sebastián; que su abuelito se llama León Ríos, y es el acusado, al cual señala; que su abuelito vive en Piedras Blancas, un barrio de San Sebastián; que ella conoció a un muchacho que se llamaba Domingo Soler; que la última vez que estuvo en la casa de su abuelito fué el día del hecho que se ventila, después de eso no ha vuelto; que estaba en la sala de la casa, donde también estaba Monserrate Lebrón; que su abuelito estaba arriba, dormido en la hamaca, adentro; que su abuelito estaba en un cuarto, ella y Monserrate estaban en la sala; que ella ese día estaba allá, que esa gente se llevaron el caballo y empezaron a maldecir debajo de la casa; que el que empezó a maldecir fué Domingo Soler, diciendo: 'mal rayo parta la madre y el padre del que me golpeó el caballo.'—Que su abuelito llamó arriba a Soler y éste fué arriba, y su abuelito le cayó a garnatadas a Domingo; que Domingo no le hizo nada y después su abuelito pidió una soga para amarrarlo, la madrina de la declarante le dijo que lo dejara, él lo dejó y cuando se fué abajo el muchacho empezó a decirle perro viejo a su abuelito, que se apeara abajo que lo iba a matar.—Que entonces su abuelito se fué detrás de él, de Domingo, que ella lo vió cuando iba el abuelito iba detrás de Domingo con un revólver que llevaba y en un portón que estaba allí le disparó; que ella cuando sintió el tiro se fué donde estaba su madrina y las dos muchachas; que al sentir el tiro corrió para atrás; que su madrina es Paca Soler, la señora de su abuelito, la madrina de la declarante; que al otro día su abuelito no le dijo nada a la declarante.

"Al preguntar el Fiscal a la testigo, si después del tiro vió a su abuelito, el abogado de la defensa se opuso por ser sugestiva la pregunta, la corte la admitió, el abogado tomó excepción, y la testigo la contestó afirmativamente.

"Y, sigue declarando la testigo: que después del tiro vió a su abuelito sentado en la hamaca y su madrina y la declarante se quedaron ambas en la cocina; que al cabo del ratito su madrina vino para arriba, que no hizo nada ni dijo nada, que su abuelito se quedó en la hamaca y no dijo nada.

"Pregunta el Fiscal:—¿Después que vino tu madrina, él se quedó

en la hamaca?—El abogado defensor se opuso por ser sugestiva la pregunta, la corte la sostuvo, y la testigo declaró afirmativamente. —La defensa tomó excepción.—Continuó la declaración de la testigo y el Fiscal la preguntó: ¿Cuántos disparos tú oiste?—La defensa se opuso alegando que era sugestiva y que todavía no se había hablado de disparo, la corte sostuvo la pregunta y la defensa tomó excepción, contestando la testigo que oyó uno nada más; que en la casa había un perro y estaba arriba, en la cocina; que no oyó ningún perro por debajo de la casa; que no le dispararon a ningún perro; que no se oyó ningún otro disparo para allí.—A preguntas del abogado J. B. García Méndez, contesta: que sabe que León Ríos le corrió detras a Domingo porque él estaba maldiciendo, Domingo maldecía y su abuelito estaba acostado en la hamaca; que Domingo es el muerto; que ella no vió a su abuelito correrle detrás, que él iba andando, corriendo no; que el revólver lo llevaba él en el bolsillo de atrás; que era un revólver ni grande ni pequeño, que no recuerda si era blanco o negro, pero lo vió; que el revólver estaba suelto dentro del bolsillo; que se veía el cabo del revólver, que el color del cabo era negro y blanco; que no se recuerda si era de otro color también, pero sabe que era blanco y negro; que está segura que era un revólver; que cuando vió correr a su abuelito estaba en la sala; que él iba andando, no corriendo; que él bajó de la casa por la escalera, y la testigo se quedó en la sala, en el comedor, en la sala al pie de la lira; que la lira está en el medio; que la testigo estaba sentada en una silla y Monserrate estaba en el comedor, pero se veía donde está ella; que cuando su abuelito se fué, ya se había ido ella; que Monserrate estaba en la sala después que vino su abuelito; que la declarante después que oyó el tiro se fué donde su madrina; que oyó el tiro desde el portón; que estaba en la sala, sintió un solo disparo; que sabe quien lo disparó, pero no lo vió cuándo disparó; que vió que él iba con el revólver y disparó; que lo sabe porque lo vió; que lo vió del portón que estaba allí y ella estaba cerca de la puerta del balcón; que entonces no estaba debajo de la lira, pero después vino acá; que ella estaba allí sentada, cerca de la lira y se paró y fué a la puerta del balcón; que eso fué como a las siete; que ya estaba oscuro; que no había luz abajo, que se veía pues no estaba muy obscuro; que vió disparar el revólver.—El abogado le pregunta: ¿No sabe para dónde a quién le disparó el tiro?—La testigo guardó silencio.—Le pregunta el abogado: ¿De modo que entonces tú no sabes a ciencia cierta a quién le dispararon el tiro?—La testigo contesta: el muchacho iba corriendo delante, pero ella no sabe a quién le dispararon, ni sintió

quejidos; que cuando sintió el disparo estaba en la sala, sentada
en una silla, al lado de la lira; que la detonación no fué muy fuerte;
que estaba sentada en la sala cuando oyó el disparo, pero de allí se
ve; que la silla esa estaba al pie de la lira, de espaldas, la decla-
rante estaba de frente al balcón, la casa es de altos, de un piso,
hay una escalera alta para subir; que la escalera está por una es-
quina del balcón, por la esquina de un lado; que subiendo la es-
calera se puede ver el frente de la casa; que su abuelito después
de disparar el tiro, subió como a la media hora; que la declarante
se fué donde estaba su madrina, estuvo allí como dos horas y no
salió durante ese tiempo; que estaba en la cocina con su madrina,
la cocina queda al pie de los cafés; que de allí se puede ver para
atrás y para delante también; que la cocina está al frente del ca-
mino también, pero de allí no se podía ver el sitio donde podía es-
tar su abuelito; que ella no salió de la cocina pero su madrina
vino para acá; que mientras estuvo en la cocina, estaba al pie de
una ventana, mirando para donde ellos, no miraba nada más; que
durante esas dos horas no volvió a ver nada; que después, como a
las dos horas su madrina se vino para acá y ella también; que ella
salió de la cocina cuando se vino su madrina; después que repar-
tió la cena; que durante esas dos horas que estuvo en la cocina,
salía, pero no para la sala, venía para el ante-pecho de la cocina;
que como a la hora vino, durante una hora no salió de la cocina, es
decir, salió al cabo ratito, vino acá y después se fué otra vez; que
salía y entraba; que después de haber ido a la cocina no vió a na-
die, como ella no iba para la sala ni para adentro, solamente vió
a su madrina y a las muchachas Juanita y Josefa que estaban en
la cocina ellas y no vió a nadie más; que a don León su abuelito
lo vió después de estar arriba; que ella estuvo en la escuela y se
salió de tercer grado; que la distancia a que estaba su abuelito
cuando hizo el disparo, es cerca, como de aquí allí, (señalando el
sitio), allí estaba el balcón y ahí estaba su abuelito cuando hizo
el disparo.

"A preguntas del Hon. Juez, contesta: que lo que ha dicho que
estaba allí, es el portón donde estaba él; que allí fué donde él hizo
el disparo; que lo vió desde la sala, sentada.

"A preguntas del Sr. Fiscal, contesta: que ella no volvió a ver
a Domingo, como ellos se iban de noche; que ella no tiene reloj,
nunca lo ha tenido; que esa noche durmió en su casa.

"Abogado: Pido que se elimine la pregunta y la contestación
porque el Fiscal no puede ahora hacer preguntas nuevas, sino sobre
los mismos hechos objeto del interrogatorio directo.

"Fiscal: Retiro la pregunta y la contestación y he terminado con la testigo.

"Abogado Manuel A. García: Para pedir que todo lo que ha declarado la testigo se elimine fundado en que la testigo ha declarado tener doce años de edad y que de acuerdo con la ley cuando un testigo no tiene catorce años de edad para que su evidencia pueda ser admitida como prueba es requisito *sine qua non* el probar la capacidad del testigo al declarar. Habiendo manifestado la testigo tener doce años de edad, y no habiéndosele hecho las necesarias preguntas para saber si estaba capacitada para declarar, de acuerdo con lo que imperativamente dispone la ley, su testimonio es como si no hubiese declarado nada y procede su completa eliminación.

"Fiscal: El Fiscal se opone, primero, porque según la ley son diez años, y segundo, porque es tardía la solicitud.

"Juez: La corte resuelve lo siguiente: la cuestión de juzgar acerca de la capacidad de un testigo, es una cuestión de discreción de la corte, y que esa capacidad se prueba de la manera como el testigo se produce.—La oposición pudo haberse hecho al principio, y desde luego, puede hacerse ahora también, pero después de haber oído la corte declarar a la testigo, comprende que es un testigo que tiene capacidad para declarar, y por consiguiente, no ha lugar a eliminar su declaración.

"Abogado: La defensa toma excepción de la resolución de la corte por los siguientes motivos: De acuerdo con la obra 'Jones on Evidence' para que pueda ser admitida la declaración de un testigo menor de catorce años de edad, es requisito indispensable que se pruebe su capacidad para declarar.—Que habiéndose levantado la cuestión al finalizar el interrogatorio de la testigo de acuerdo con la ley, y no habiéndose probado en ningún momento tal capacidad por parte de la testigo, de una manera específica, procedía la eliminación de todo lo por ella declarado.—Que la cuestión levantada no es una cuestión discrecional de la corte, sino que es mandatoria e imperativa de acuerdo con las prescripciones de la ley, y que tal eliminación debe concederse sin que la conclusión a que haya llegado la corte a virtud de esta declaración, por la manera de declarar y por las demás circunstancias que hayan envuelto su declaración, no es aplicable en estos casos cuando la ley es de tono imperativo.—Presentamos como jurisprudencia, además, el caso de *El Pueblo* vs. *Rivera*, 12 D.P.R. 408, porque si bien en este caso se resolvió que siendo la testigo menor de diez años era necesario probar su capacidad, esto no excluye la forma imperativa del texto

de la ley que decide que siendo menor de catorce años tal capacidad debe demostrarse enteramente antes de admitir la declaración y antes de resolver la eliminación.''

Hemos transcrito toda la declaración y sus incidentes a fin de que los hechos hablen por sí mismos. No creemos que pueda concluirse que las preguntas objetadas fueran sugestivas y es evidente que la objeción con respecto a no haberse investigado previamente la capacidad de la testigo fué tardía. Cuando la objeción se presentó tenía la corte una amplia base para juzgar la capacidad de la testigo y correctamente la decidió en sentido afirmativo. Difícilmente una persona mayor de edad hubiera declarado en forma más clara, precisa y consistente que la niña Ramona Irizarry. Véase el caso de *El Pueblo* vs. *Párquez,* decidido en el día de hoy.

[4] Los errores 6 y 7, se formulan de la siguiente manera:

''6. Erró la corte inferior al permitir que a preguntas del Fiscal, la testigo Monserrate Lebrón declarase cuando fué la primera vez que con anterioridad a cierta fecha había estado en la casa de don León Ríos, etc.

''7. Erró la corte de distrito al permitir que el Fiscal impugnara la veracidad de su propia testigo Monserrate Lebrón en la forma en que lo hizo.''

La declaración de la testigo Monserrate Lebrón, yerna del acusado, ocupa siete páginas del récord y sería alargar innecesariamente esta opinión si la transcribiéramos íntegra. Comienza describiendo los hechos en armonía con la niña Irizarry, pero luego contestando las repreguntas que le hiciera el abogado defensor, asegura que cuando el acusado bajó no llevaba revólver y que el disparo que el acusado hizo lo fué después desde los altos de la casa al sentir el ladrido de un perro. El Fiscal entonces expresando haber sido sorprendido por las manifestaciones de la testigo, le hizo la pregunta objetada y luego le interrogó con respecto

a otras manifestaciones hechas por ella misma ante el juez municipal y el propio Fiscal, todo según dijo para impugnar su testimonio.

A nuestro juicio no hubo base para la objeción. La repregunta era permisible. Y el Fiscal de acuerdo con el mismo artículo invocado por el apelante—159 de la Ley de Evidencia—, y más especialmente con el 243 del Código de Enjuiciamiento Criminal que es el directamente aplicable, intentó preparar su caso para la impugnación.

En el caso de *El Pueblo* v. *Colón,* 25 D.P.R. 629, 630, esta corte se expresó así:

"El apelante también alega error por haberse permitido a un testigo declarar acerca de lo que la agredida manifestó al juez municipal. La agredida negó haber dicho al juez que el acusado le había pegado. Sin haber intentado el Gobierno demostrar que fuera sorprendido por la declaración de ella, esta prueba de impugnación fué presentada. Hemos comentado inequívocamente esta clase de procedimiento en el caso de *El Pueblo* vs. *Rojas,* 16 D.P.R. 251, y, sin embargo, ni el juez de la corte inferior ni las partes en este caso parecen tener conocimiento de ello. E igual pronunciamiento se hizo en el caso de *El Pueblo* v. *Ramírez de Arellano,* 25 D.P.R. 263. El Gobierno no debe presentar un testigo, y sin demostrar sorpresa, traer ante la corte prueba de referencia recriminándolo bajo el pretexto de que existe contradicción."

Como puede verse en el caso anterior y en los en él citados, el Fiscal no estableció previamente, como aquí, las bases para la impugnación, haciendo constar su sorpresa.

Al analizar la prueba volveremos a referirnos a la testigo Lebrón.

[5, 6] Los errores 8, 9, y 10, se formularon en relación con la declaración del perito médico Dr. Rodríguez Cancio, así:

"8. Erró la corte inferior al permitir que el perito médico Dr. Miguel Rodríguez Cancio declarase cuál había sido la causa de la muerte de Domingo Soler, no habiéndose alegado tal extremo en la acusación.

"9. Erró la corte inferior al permitir que el fiscal utilizara al perito médico como perito en armas de fuego sin serlo según él mismo indicó.

"10. Erró la corte inferior al permitir al fiscal preguntar al perito médico si había algunas balas o cápsulas de revólver en casa del acusado León Ríos Medina."

Después de lo que hemos resuelto al estudiar la primera de las excepciones formuladas, lógicamente tenemos que concluir que no se cometió el octavo de los errores señalados.

En cuanto a los errores 9 y 10 bastará decir que no aparece que la declaración del perito médico penetrara en el campo de la balística. Después de declarar que el joven Soler murió a consecuencia de una herida del cerebro, causada por un proyectil que penetró por la región occipital, atravesó el hemisferio cerebral izquierdo quedando alojado en la dura-mater del hueso frontal; que la bala iba de atrás a adelante directamente, horizontalmente, y que el tiro fué disparado por la espalda, todo ello sin objeción específica, se le preguntó si el día en que estuvo en la casa del acusado con objeto de reconocer el cadáver de Soler, le enseñaron un revólver y contestó que sí. No vemos que se necesite ser perito en armas de fuego para poder contestar a esa pregunta, ni tampoco a la otra que le hiciera uno de los jurados en relación con el calibre de la bala extraída por él del cerebro de Soler, especialmente cuando la contestación fué así: "que creía que la bala extraída era de calibre nueve, pero no satisfecho todavía de su opinión, porque él no es perito en balística, consultó con el jefe de policía al entregársela al juez, y el jefe ratificó que era calibre nueve." Debe hacerse constar que con respecto a la última contestación no consta objeción específica en los autos.

[7] El undécimo error, que es el único que a juicio del Fiscal tiene importancia y podría producir la revocación de la sentencia, se señaló así:

"Erró la corte inferior al permitir al Fiscal manifestar mientras declaraba el testigo José Antonio Vargas QUE ÉL TENÍA LA CON-

VICCIÓN ABSOLUTA DE QUE EL ACUSADO ERA CULPABLE Y DE QUE NO DESCANSARÍA HASTA QUE DICHO ACUSADO FUERA A PRESIDIO, etc.''

Dicho error debe estudiarse conjuntamente con el 15, que se formuló como sigue:

"15. Erró el tribunal inferior al no dictar instrucciones específicas en el sentido de que el jurado no debía tomar en consideración las manifestaciones impropias hechas por el Juez de San Sebastián José A. Vargas en su declaración."

Para juzgar del mérito de las cuestiones suscitadas nos vemos obligados otra vez a copiar extensamente de los autos, transcribiendo íntegra la declaración del testigo José Antonio Vargas. Dice así:

"A preguntas del Fiscal contesta: Que su nombre es José Antonio Vargas, que es Juez de la Corte Municipal de San Sebastián y conoce al acusado León Ríos Medina; que allá, el día 28 de diciembre, tuvo que intervenir con el acusado en su capacidad oficial de Juez.—Al invitársele por el Fiscal para explicar al Jurado la intervención que tuvo en el caso, empieza manifestando que el 28 de diciembre del año pasado fué notificado en su capacidad oficial de Juez de la Corte Municipal de San Sebastián. . . . . En este momento el abogado defensor J. B. García Méndez se opuso a que dijese lo que le notificaron, que simplemente declarase cuáles habían sido sus actuaciones; y la corte declaró que la manera del testigo venir a la cuestión era correcta, por lo que la defensa tomó excepción.—Y sigue declarando el testigo: que el 28 de diciembre del año pasado en su capacidad oficial de Juez Municipal de San Sebastián, se trasladó al barrio de Calabazas, como consecuencia de una notificación que se le hizo de la aparición de un cadáver en dicha finca, barrio Calabazas de San Sebastián, y encontró el cadáver, que más tarde supo era el de Domingo Ríos o Domingo Soler.—Al preguntar el Fiscal al testigo si en algún momento León Ríos aceptó que ese cadáver era de Domingo Soler, el abogado defensor se opuso alegando que la pregunta era inadmisible por no ser esa la forma de traer una admisión del acusado.—La corte sostuvo la pregunta y la defensa tomó excepción.—El testigo contestó: 'Sí señor, aceptó.' 'Que el testigo habló con el acusado; que el declarante encontró el cadáver; que cuando llegó a la casa de José León Ríos él, personalmento lo llevó al sitio donde estaba el cadáver al que encontró en una posición horizontal, en un estado de rigidez cadavérica y las

manos cuidadosamente puestas sobre su pecho, en una posición exactamente igual a como se encuentran todos los cadáveres en los ataúdes; el cadáver yacía en una zanja que era exactamente igual de ancho o un poco más ancha que el cuerpo del muerto Domingo León Ríos, la zanja tenía un declive y la cabeza estaba hacia abajo; que esa fué la posición en que encontró al cadáver; que no sabe hacia qué dirección miraba el cadáver, porque tenía los ojos casi cerrados, pero estaba boca-arriba con las manos sobre el pecho; que dejó el cadáver tal como lo encontró, se trasladó a la casa donde sostuvo un diálogo bastante extenso con el señor José León Ríos, tratando de investigar los móviles del crímen y tratando de que él le diera luz sobre quién podía ser la persona que había asesinado a su hijo; que el declarante mandó entonces al Márshal, si mal no recuerda, a buscar al Dr. Miguel Rodríguez Cancio al pueblo, y el cadáver permaneció hasta que el Dr. M. Rodríguez Cancio llegó al campo.—Mientras tanto el declarante estuvo tratando de investigar en la casa con unos y con otros, quién podía ser la persona que había cometido el crimen, y especialmente con León Ríos, con quien hizo hincapié para que le diera luz sobre la persona que había asesinado a su hijo;—que allí ocupó un revólver.—A instancia de la defensa de que se hicieran otras preguntas preliminares para que se describiese el revólver y luego presentarlo para ver si es el mismo, la corte resolvió que el Fiscal, hiciese una pequeña investigación preliminar del arma.—El testigo contestó entonces a las preguntas del señor Fiscal, en esta forma: que ocupó un revólver algo usado, un poco mohoso, de nueve milímetros; que esa es toda la descripción, porque no es técnico en cuestión de revólver; que esa arma tenía dos cápsulas disparadas y tres cápsulas sin disparar; que ese revólver le fué entregado en la propia casa del Sr. León Ríos; que se lo entregó la señora del acusado; que tenía dos cápsulas disparadas, y sin disparar tres, había tres con los plomos en los casquillos; había dos que tenían los casquillos vacíos; que había dos cápsulas disparadas; que él las tocó y los dedos se le mancharon de pólvora; que el revólver se lo entregaron en la sala de la casa y el acusado estaba presente; que el Jefe de la Policía de San Sebastián estaba en la casa; que no recuerda con exactitud el sitio en que estaba el revólver; que esto que se le enseña es el plomo de la bala; que ha visto ese plomo con anterioridad, pues se lo entregó el Dr. Miguel Rodríguez Cancio.

"Le repregunta el abogado defensor don Manuel A. García, y contesta: que él es Juez Municipal de San Sebastián; que esa arma que ha reconocido fué entregada voluntariamente al testigo; que

tuvo que pedirla, le fué entregada a requerimiento suyo y se le entregó sin oposición alguna; que recuerda perfectamente que encontró dos cápsulas disparadas y también recuerda perfectamente que había tres sin disparar; que olió los dos casquillos disparados; que olió los casquillos y llegó a la conclusión de que ambas balas habían sido disparadas recientemente, en relación con el día en que las examinó; que las dos cápsulas disparadas estaban en la masa del revólver y llegó a la conclusión de que estaban recientemente disparadas.—Le pregunta el abogado: El señor testigo en su capacidad de Juez Municipal de San Sebastián, ¿tiene mucho interés en este asunto?—El testigo contestó: 'Tengo.'—Abogado:—Desde luego, al hacer esta pregunta yo pido que el testigo, y en eso me amparo en la ley, me conteste exactamente la pregunta sin rodeo, subterfugio y vacilación, y cuestiones que nada tienen que ver con la cuestión preguntada por mí, sencillamente pregunto al testigo si tiene interés en este asunto, me puede contestar diciendo que sí o que nó, entonces estoy satisfecho.—Fiscal: Me opongo, eso es injusto con un testigo.—El testigo tiene perfectísimo derecho de aclarar la pregunta.—Juez: Cuando el Fiscal hace una pregunta en forma que se conteste sí o nó generalmente el abogado se opone diciendo que la pregunta es sugestiva y ahora su señoría está haciendo una pregunta de las que los abogados llaman sugestivas y le exige al testigo que la conteste dentro de la sugestión esa.—Abogado: Estamos en la repregunta, y esas condiciones de la ley no son aplicables en la repregunta.—Juez: A ningún testigo se le puede poner condición para que conteste, porque es nulo.

''Y, sigue declarando el testigo: Que en este asunto tiene el interés que tiene en todos los casos en que interviene como Juez y como ciudadano, que se haga estricta justicia, en cualquier sentido que sea.—Abogado: En este caso el testigo, demostrando tener ese interés como en todos los asuntos que se someten a su consideración, en este caso específico el testigo no ha hecho manifestaciones en las que ha afirmado que tiene interés absoluto en este asunto y que no descansará hasta que León Ríos vaya a Presidio?—¿Ha dicho eso, o no lo ha dicho, bajo palabra de honor, por la caballerosidad y el juramento prestado, que no descansará en este asunto hasta que este hombre vaya a presidio, ¿lo ha manifestado, o nó?—Testigo: 'He manifestado en público, y he manifestado por escrito, caballerosa, valientemente, al Attorney General que tengo la convicción absoluta. . . . . Abogado:—No es esa mi pregunta: ¿Ha dicho el testigo o nó lo ha dicho que no descansará en este caso hasta que este hombre vaya a Presidio?

"Fiscal: Yo creo que el testigo puede perfectamente aclarar si ha dicho y si no ha dicho y por qué ha dicho.

"Abogado: Le pregunto si él ha manifestado en alguna ocasión que en este caso no descansará hasta que este hombre no fuera al presidio, y el testigo deberá decirme si lo dijo así o nó.—Fiscal: Y le contestó que lo ha dicho por escrito, y yo digo que no descansaré hasta que este hombre, teniendo la convicción absoluta de que cometió ese delito. . . . .

"Juez: La corte ordena que sea eliminada la manifestación del Fiscal, porque no puede hacerla ante el Jurado.

"Abogado: Acatando desde luego la resolución de la corte, que es justa, sin embargo quiero hacer constar en este acto, que el Fiscal en corte abierta, habiéndolo oído los señores del jurado, ha manifestado que él tiene la convicción absoluta de que el acusado es culpable y de que él no descansará hasta que este hombre vaya a presidio.—Tomamos excepción de esas manifestaciones del Fiscal por ser abusivas, arbitrarias, contra todo principio de ética profesional y contrarias a la Ley.

"Fiscal: El Fiscal es representante de El Pueblo y tiene que ver que se haga justicia, y el Fiscal no cumpliría con su deber si cuando él hace una investigación y llega a la conclusión de que se ha cometido un delito, si él no busca los medios que le da la ley para que el acusado vaya ante el Jurado imparcial.—Si el Fiscal no creyera que en este caso no se ha cometido un delito y que hay un culpable y que el culpable es el acusado, que se trae aquí después de un Gran Jurado traer una acusación fundada, nunca traería a ningún acusado ante el Jurado.—Juez: La corte resuelve que el testigo conteste la pregunta y dé las explicaciones que necesite para hacer inteligible su contestación.

"Abogado: Mi pregunta es la siguiente: ¿en algún momento u ocasión, el Juez que está declarando, señor Vargas, ha manifestado que no descansará en este asunto hasta tanto no conseguir que el acusado vaya a Presidio?—¿Ha manifestado eso, o nó?

"Testigo: El abogado defensor invoca mi capacidad de Juez y mi caballerosidad, yo debo por consiguiente, volviendo por los fueros del honor, hacer clara mi contestación para que mi posición quede diáfana ante la corte, los señores del Jurado, y ante el público.—Yo he manifestado con valor, con caballerosidad, mi convicción absoluta, a la cual nadie puede privarme que llegue, a la luz de mi propio criterio, como abogado y como ciudadano, de la culpabilidad de este hombre, y en varios sitios públicos, entre amigos, no tengo inconveniente ninguno en reproducir las palabras que he di-

cho aquí, porque nunca me retracto, lo he tratado duramente por-
que es un hombre que ya pasó por las galeras del presidio. . . . .
Abogado: Pido que se elimine esa declaración del récord de este
caso:—Fiscal: Me allano.—Juez: La corte ordena la eliminación de
esta última parte.—Abogado: Y pido también que la corte llame la
atención al testigo que conteste solamente las preguntas que deseo
que me conteste, sin tratar de impresionar al Jurado, o tratar cues-
tiones que, o no son ciertas o no son admisibles.—¿El testigo mani-
festó o nó en alguna ocasión, que no descansaría hasta no meter a
este hombre a Presidio?—Fiscal: Me opongo, porque la manera de
hacer esta clase de preguntas para impugnar, es diciendo Ud. en tal
fecha, delante de tal persona y en tal sitio, ¿no manifestó esto y esto?

"Abogado: Yo no estoy impugnando la veracidad del testigo, la
pregunta fué admitida ya.—Juez: Testigo, Ud. conteste la pregunta
pero sin dar opinión particular ninguna, ahora usted puede explicar
su proceder, pero sin dar opiniones respecto a la situación del acu-
sado.—El testigo contesta que ha referido un hecho que consta en
el récord.—Y el testigo sigue exponiendo: que él contesta categóri-
camente, después lo explica: que lo ha dicho en más de un sitio,
lo ha dicho en varios sitios, y he dicho esto, porque después de ha-
ber personalmente practicado una minuciosa investigación, llegué a
la conclusión. . . . . Abogado: Me opongo a las conclusiones a que
haya llegado el testigo.—La defensa está conforme con la manifesta-
ción y no deseo que conteste nada más.—Juez: El testigo puede de-
clarar sin dar opiniones.—Testigo: Hice esas manifestaciones por-
que ellas correspondían a actuaciones .mías que yo consideraba como
un deber sagrado por la lealtad que le debo al Gobierno de Puerto
Rico.

"Abogado: Finalmente, testigo, ¿no dijo el testigo en alguna
ocasión que estaba ensañado contra este acusado y que si este caso
se trasladaba a otro distrito fuera de Aguadilla, haría una campaña
en el periódico *El Mundo* contra dicho acusado?—¿Lo manifestó o
nó lo manifestó?—¿Manifestó que estaba ensañado contra este acu-
sado, o nó, y si lo manifestó declare si no dijo que en caso que este
caso se trasladase a otro distrito, haría una campaña en el perió-
dico *El Mundo* con objeto de conseguir un ambiente desfavorable
al acusado?

"Fiscal: Me opongo, hay que decir sitio, tiempo y personas.—
Abogado: En la Secretaría de esta Corte de Distrito, el día que se
sometía este caso de León Ríos al Gran Jurado de la Corte de Dis-
trito de Aguadilla, manifestó o nó manifestó el testigo que estaba
ensañado contra este acusado, y que de trasladarse el caso a otro dis-

trito haría una campaña en el periódico *El Mundo* para levantar un
ambiente desfavorable, de manera que él fuera condenado?—¿Manifestó o no manifestó eso en la Secretaría de esta Corte de Distrito
el día que se sometía este caso al Gran Jurado, por lo menos en presencia de mi compañero y hermano y otras personas, pero me basta
con la caballerosidad del testigo:—Testigo: Yo quiero advertir que
voy a contestar todo lo que me pregunte, no me retracto nunca de
lo que digo, yo asumo todas las responsabilidades, de manera que el
Fiscal sabe que voy a contestarle todo, estrictamente la verdad,
ahora con esa misma caballerosidad y honorabilidad quiero hacer
constar que en la Secretaría de la Corte, delante del señor García
Méndez y de otros caballeros que por su alta posición y gerarquía
no quiero nombrar aquí, pero que deben estar en el ánimo de todos,
hice manifestaciones en el sentido de que tenía un gran prejuicio
contra este acusado, y quiero hacer constar que no recuerdo que
haya dicho en la Secretaría de la Corte de Distrito de Aguadilla,
que iba a hacer una campaña contra León Ríos en el periódico, sí
recuerdo que a mi compañero, el señor Juan Bautista García Méndez, de abogado a abogado, solos los dos, le dije que si este juicio se
trasladaba, yo iniciaría una campaña en el periódico para hacer pública la historia pasada de José León Ríos Medina. Eso fué confidencialmente al Sr. Juan Bautista García Méndez, en San Sebastián.

"El Fiscal le repregunta, y el testigo contesta: Que él hizo la
investigación preliminar de este caso; que el tiempo que hace que
ocurrieron los hechos que se imputan al acusado, es el tiempo que
ha transcurrido del 28 de diciembre del año pasado a la fecha; que
el plomo ese lo entregó al Sr. Fiscal José Julián Acosta; que ese
es el mismo plomo que le entregó el doctor Cancio.—El Fiscal presenta como prueba, un plomo, tres balas y dos cartuchos vacíos, que
fueron admitidos sin oposición."

Invoca el apelante en apoyo de los errores que analizamos, el caso de *El Pueblo* v. *Machado,* 31 D. P. R. 42, y los
textos de Cyc. y Ruling Case Law.

En *El Pueblo* v. *Machado,* esta Corte resolvió:

"Antes de que empezara a declarar un testigo del acusado el
abogado de éste pidió al jurado que prestara atención a la declaración del testigo porque éste se encontraba junto al acusado antes de
ocurrir el homicidio. El Fiscal replicó así: 'Y yo anuncio que este
testigo es un perjuro y que he mandado buscar al presidente del

Gran Jurado para que veáis lo que él declaró ante ellos.' *Se resolvió:* que constituyó error perjudicial el no impedir las manifestaciones del fiscal o por lo menos el no llamar fuertemente la atención del jurado para que no las tuviera en cuenta al apreciar la credibilidad de dicho testigo, con mayor razón cuanto que no se presentó evidencia alguna para atacar su credibilidad.''

Cyc. condensa la jurisprudencia así:

''Es un error que lleva consigo una revocación el que el fiscal en su informe ante el jurado declare su opinión o creencia personal, sin decir expresamente que está basada en la prueba, de que el acusado es culpable, o manifieste que el abogado del acusado aconsejó a éste que se declarara culpable. El fiscal puede, sin embargo, argumentar ante el jurado que la prueba en su concepto muestra la culpabilidad o que lo ha convencido de que el acusado es culpable. Tal argumentación no hace necesaria la concesión de un nuevo juicio.'' 12 Cyc. 580-81.

Y Ruling Case Law, dice:

''La opinión personal del fiscal respecto a la culpabilidad del acusado no es prueba, y la sanción de dicha opinión por la corte es un grave error.'' 2 R.C.L. 415.

Examinados los hechos ocurridos a la luz de la propia jurisprudencia invocada por el apelante, no creemos que se haya cometido ningún error fundamental que lleve consigo la revocación de la sentencia apelada. No hay duda alguna de que el juez municipal en su investigación y manifestaciones fué más allá de lo que exigía el sereno cumplimiento de su deber, llegando a los lindes del apasionamiento, pero no creemos que su actitud desviara impropiamente el juicio del jurado. Al contrario pudo producir en el ánimo de los jueces de hecho un resultado contraproducente.

En cuanto a las manifestaciones del Fiscal, no aparece que dicho funcionario llegara a terminar su pensamiento y en todo caso la eliminación fué acordada inmediatamente por la corte.

El caso de Machado, *supra,* es distinto. Se refiere al

juicio de la credibilidad de un testigo presentado como perjuro por la sola afirmación del fiscal.

Creemos que si algún error hubo, no fué perjudicial y las siguientes instrucciones trasmitidas luego por el juez al jurado dejaron las cosas en su propio sitio y pueden estimarse como suficientes:

"Las afirmaciones de los abogados, tanto del Fiscal como de la defensa no constituyen evidencia en el caso, y no deben tomarse como tales en la deliberación del jurado, respecto al veredicto.

"En este caso particular, la corte quiere llamar la atención específicamente de que tanto el abogado defensor como el Fiscal, en el sagrado cumplimiento de sus deberes, llevados de su más alta impresión, llegaron al extremo de hacer afirmaciones en sus discursos, sobre las que la corte hubo de llamarles luego la atención, con objeto de ahora en las instrucciones llamar vuestra atención a que estas manifestaciones de los Letrados en el cumplimiento de su deber, no deben tenerlas en cuenta los Sres. del Jurado, porque no son parte de la evidencia, no son más que prueba de que cada uno de los compañeros ha querido cumplir con su deber y demostrarlo de una manera que no hubiera duda razonable en el cumplimiento del mismo.—"

\*　　\*　　\*　　\*　　\*　　\*　　\*

"La corte os instruye, Sres, del Jurado, que no deberéis tomar en consideración ninguna opinión que en el curso del juicio hayan emitido los abogados."

[8] Los errores 12 y 13, se señalan del siguiente modo:

"12. Erró la corte inferior al admitir que en el *cross-examination* el Fiscal investigara con la esposa del acusado quién era la madre de Domingo Soler.

"13. Erró la Corte de Distrito de Aguadilla al permitir que se repreguntara a la testigo Francisca Soler, esposa del acusado (que fué presentada únicamente como testigo de impugnación) sobre extremos que podían perjudicar al acusado, o que declarase en contra de éste."

El incidente fué largo, ocupa más de cuatro páginas, pero puede sintetizarse así: La esposa del acusado fué presentada a declarar por la defensa y después de hacerlo ampliamente · al repreguntarla el Fiscal la defensa se opuso. Se

alegó que el acusado había dado su consentimiento y la defensa contestó: "El ha dado su consentimiento para que declare a su favor y no en su contra."

Basta lo dicho para concluir que el juez no cometió error al permitir el contrainterrogatorio. Una vez presentada la testigo por la defensa, el Fiscal tenía derecho a averiguar hechos que estaban envueltos en verdad en el interrogatorio directo y a aquilatar la veracidad de la testigo.

[9] Dice el décimocuarto señalamiento de error:

"14. Erró la corte inferior al no permitir a la defensa en su informe al jurado que éste en su argumentación hiciera relación a un caso célebre ocurrido en la ciudad de París y para demostrar lo necesario de una prueba clara para una convicción."

Toda la constancia que se encuentra en el récord en relación con este error es la que sigue:

"Durante el informe de la defensa ante el jurado, el abogado pretendió hacer relación a cierto caso ocurrido recientemente en París, el Fiscal se opuso, la corte declaró con lugar la oposición, y la defensa tomó excepción."

Como puede apreciarse en seguida, no hay base suficiente para discutirlo.

[10] El error 16 es como sigue:

"16. Erró el tribunal inferior al negarse a trasmitir a los Sres. del Jurado la siguiente instrucción: 'La corte instruye a los señores del jurado, que al considerar la prueba aportada, deben prescindir en absoluto de la historia pasada del acusado y que ella no debe influir ni en favor ni en contra del acusado en el veredicto que haya de traerse."

La corte se negó a trasmitir la instrucción "por no haber sido objeto de prueba los antecedentes del acusado."

Al discutir el error señala el apelante tres momentos en que se habló de los antecedentes del acusado. Dos en las preguntas que se hicieron a los jurados cuando se estaba constituyendo el tribunal de hecho y el tercero al declarar el testigo Vargas. Las preguntas a los jurados antes de

constituir el tribunal no forman parte de la prueba del juicio, y lo dicho por Vargas fué eliminado a petición de la defensa, allanándose el Fiscal.

[11] Llegamos por último al error 17 en que se impugna la prueba. La principal declaración ha sido transcrita. Constituye una acusación directa, firme, completa. Se trató de contradecirla por medio de las declaraciones de la yerna y la esposa del acusado colocando a la niña declarante en un sitio de la casa desde donde era imposible que viera a su abuelo disparar y con respecto a su afirmación de que su abuelo al bajar de la casa llevaba revólver, pero fué en vano. El jurado la creyó y todas las demás circunstancias, a saber: el revólver ocupado: el sitio en que Soler fué encontrado: la herida que recibiera y la bala que de su cráneo se extrajo: el disgusto ocurrido, todas, repetimos, revelan que fué ella la que dijo la verdad.

*Debe confirmarse la sentencia recurrida.*