EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* FRANCISCO RODRÍGUEZ HERNÁNDEZ acusado y apelante.

No. 2647.—*Visto:* Mayo 19, 1926. *Resuelto:* Marzo 17, 1927.

1. DERECHO PENAL——APELACIÓN Y ERROR, Y CERTIORARI——REVISIÓN — ERRORES PERJUDICIALES — ADMISIÓN DE PRUEBA OBJETADA — DECLARACIONES PRESTADAS EN INVESTIGACIONES PRELIMINARES. — La admisión de declaraciones juradas tomadas en la investigación preliminar de la causa presentadas por el fiscal para desacreditar sus testigos y demostrar que han incurrido en contradicciones es error perjudicial especialmente cuando ninguna de dichas declaraciones demuestra contradicción alguna sobre las materias a que se refieren las alegadas contradicciones y para su admisión no se establece base alguna previa para darles a los testigos la oportunidad de explicar sus manifestaciones contradictorias.

2. DERECHO PENAL—APELACIÓN Y ERROR, Y CERTIORARI—RESOLUCIÓN Y DISPOSICIÓN DEL CASO—REVOCACIÓN DE LA SENTENCIA APELADA—EN GENERAL— COMISIÓN DE ERROR PERJUDICIAL EN EL CURSO DEL JUICIO.—Cuando en el curso de un juicio se comete un error, y en apelación no se demuestra que no hubo perjuicio y los autos demuestran que lo hubo, procede revocar la sentencia apelada.

SENTENCIA de *Tomás Bryan*, J. (Aguadilla), condenando al acusado por delito de Homicidio Voluntario. *Revocada*, y devuelto el caso para nuevo juicio.

*García Méndez & García Méndez*, abogados del apelante; *José E. Figueras*, abogado de *El Pueblo*, apelado.

EL JUEZ ASOCIADO SEÑOR WOLF, emitió la opinión del tribunal.

Francisco Rodríguez Hernández dió muerte a Laureano González Badillo, y se le acusó de asesinato en segundo grado, siendo convicto de homicidio voluntario. En la acusación se alegó y se demostró, según se admite, que Rodríguez no solamente hizo cinco disparos a González, sino también que le infirió varias heridas de arma blanca. El acusado solicitó su absolución bajo la teoría de defensa propia.

[1] En el juicio, declaró por El Pueblo el testigo Aurelio Rodríguez. Declaró que oyó tres disparos, y al correr al sitio, encontró al acusado en el camino; que le preguntó al acusado sobre lo ocurrido, y éste contestó que había tenido que matar a Laureano González, porque él le había dicho que sacara unos animales de la finca, pero que González inmediatamente atacó al acusado con un machete, tirándole varios tajos. Casi al terminar el testigo su declaración, el fiscal, sin preguntar o decir nada más, le interrogó al testigo si no había manifestado en otra ocasión que estaba emparentado con el acusado, y el testigo negó tal aseveración y dijo que en realidad de verdad no estaba emparentado con el acusado. Este era un testigo de El Pueblo, y si el fiscal fué sorprendido por ciertos extremos de su declaración con respecto a la teoría de defensa propia del acusado, no obstante, el fiscal no le hizo pregunta alguna tendente a demostrar que en ocasiones anteriores había hecho manifestaciones contradictorias.

Aurelio Cordero fué otro testigo de El Pueblo, y, en relación con el hecho de que el interfecto portaba un machete y amenazó al acusado, declaró substancialmente en la misma

forma en que lo hizo el testigo que lo precedió. Después
que el testigo declaró que el acusado dijo que el interfecto
se le había ido encima con el machete, el fiscal le preguntó
si le había hecho al fiscal esta manifestación anteriormente,
a lo que el testigo replicó afirmativamente. Y el fiscal en-
tonces le preguntó: "¿O simplemente que este acusado le
había dicho que había tenido que matar al otro nada más?"
En otra parte del interrogatorio, aparece que el fiscal leía
de algún documento que tenía ante sí, y preguntó al testigo
si no había dicho antes que había visto el revólver, etc., que
el acusado le había dicho que había matado a Laureano
González, y que el acusado se fué sin decir nada más. El
fiscal no le mostró al testigo el documento del cual estaba
leyendo.

Posteriormente, y después de haber declarado el testigo
Aurelio Cordero, que fué el último presentado por El Pue-
blo, el fiscal manifestó: "Sr. Juez, yo ofrecería la investi-
gación practicada por mi predecesor para que el Jurado
pudiera llegar al convencimiento de que si al expresarse en
la forma que lo han hecho estos testigos han incurrido en
contradicciones. Resulta que al fiscal le dijeron que no ha-
bían oído más que ciertas cosas y después salen diciendo
que el acusado se quejó de que el otro lo había amenazado
y le había atacado con un machete."—Juez: "Presentaría,
o la presenta?"—Fiscal: "Anuncio que voy a presentarla."
—Abogado: "Nos oponemos."—Juez: (Al fiscal): "A los
efectos de tachar en parte la veracidad de esos testigos?"
—Fiscal: "Sí, señor."—Abogado: "No nos afectaría la
presentación de esto porque veo que hay casi una exactitud
completa entre lo que dice eso y los testigos, quizás una di-
ferencia en lo que le dijo el acusado, pero para la claridad
del procedimiento, para ajustarse estrictamente a las leyes
de evidencia, nos oponemos porque está prohibido taxativa-
mente por el artículo 423 del Código de Enjuiciamiento Cri-
minal la presentación por parte del fiscal de declaraciones

juradas tomadas, bien por el propio fiscal o por un "Committing Magistrate," o Juez Municipal, en la investigación de un caso, que luego se ha de someter ante un Jurado.— Juez: "La corte admite esas declaraciones, porque es con objeto de impugnar o tachar en parte la declaración de esos testigos."—Abogado: "Tomamos excepción por el fundamento de que de acuerdo con la Ley, la parte que presenta un testigo no podrá impugnar su veracidad, sino contradecirle, demostrando que en otras ocasiones ha hecho manifestaciones contrarias, pero la presentación como evidencia de estas declaraciones tomadas en la investigación del caso no es otra cosa que la impugnación directa de la veracidad de sus testigos. Y porque además, para que se pueda impugnar la veracidad de un testigo es necesario anunciarlo cuando está declarando ese testigo, y porque además para poder impugnar y demostrar que en ocasiones distintas el testigo ha hecho manifestaciones distintas, es necesario, de acuerdo con la resolución en el caso de *El Pueblo* v. *Kent,* 10 D.P.R. 347, que se le muestre el documento en que constan las manifestaciones que se alegan ser contrarias a las que hiciera en corte abierta." La admisión por la corte de estas manifestaciones se señala como error.

A Aurelio Rodríguez, como hemos visto, sólo se le pregunta si es hermano del acusado, y si no lo declaró así ante el fiscal. Su deposición dice que ellos eran hermanos, y en la silla de los testigos, niega que lo fueran. La declaración escrita o deposición demuestra que este testigo no manifestó en su examen original que el acusado había dicho que había sido atacado y amenazado por el interfecto con un machete que portaba. En ningún sitio de su declaración, aunque parezca algo extraño decirlo, se le pidió al testigo Aurelio Rodríguez que explicara esta supuesta contradicción.

A Aurelio Cordero fué que se le preguntó si había hecho una declaración contradictoria con respecto a lo que el acusado le había dicho. El testigo estaba bajo la impresión

de que él había hecho ante el fiscal la misma declaración que la que hizo durante el juicio. Sin embargo, al examinarse su deposición resulta que a él no se le preguntó lo que el acusado le había dicho, y su deposición guarda absoluto silencio sobre este particular.

De suerte que tenemos dos deposiciones presentadas en evidencia, ninguna de las cuales demuestra contradicción alguna sobre las materias que se pidió a estos dos testigos que explicaran durante el juicio.

Hubo además otro testigo que declaró más o menos en la misma forma, a saber, que el acusado había actuado en defensa propia, o había dicho que así lo había hecho. Entonces el fiscal sentó o trató de sentar la base para contradecirlo, pero jamás se ofreció en evidencia ninguna declaración contradictoria con respecto a este testigo determinado. La pretendida evidencia contradictoria fué exclusivamente con respecto a los otros dos testigos a que hemos hecho referencia.

El fiscal de esta corte reconoce que fué error admitir estas declaraciones, y nos llama la atención al artículo 243 del Código de Enjuiciamiento Criminal, el cual dice:

"A la parte que presente un testigo, no le es permitido impugnar su veracidad probando que es persona de mala reputación; pero podrá contradecirlo, aduciendo pruebas en contrario, y demostrar que en ocasiones anteriores, ha hecho manifestaciones que no concuerdan con su actual declaración."

Más particularmente, el artículo 245 dispone lo que sigue:

"También puede ser impugnada la veracidad de un testigo por medio de prueba que demuestre que en ocasiones anteriores ha hecho manifestaciones que no concuerdan con su actual declaración; pero antes de hacerlo, se le referirán dichas manifestaciones, con expresión de la época, lugares y personas que hubieren estado presentes al hacerlas, y se le preguntará si dichas manifestaciones fueron hechas por él, permitiéndosele que las explique, si contestare afirmativamente. Si las manifestaciones fueren escritas, se enseñarán al testigo antes de interrogarle acerca de ellas."

Disposiciones similares están contenidas además en la Ley de Evidencia, artículos 156 y 159.

Que a un testigo debe dársele la oportunidad de explicar sus manifestaciones contradictorias se desprende claramente de toda la jurisprudencia, y especialmente del caso de *El Pueblo* v. *Santiago*, 16 D.P.R. 471. Sin tal base por vía de examen preliminar, estas deposiciones eran completamente inadmisibles. Esto lo hemos declarado terminantemente en el caso de *El Pueblo* v. *Rojas*, 16 D.P.R. 252, y en otros casos más. En el primero dijimos:

"El objeto del artículo 243 citado anteriormente es impedir que el estado sea sorprendido y permitirle que contradiga o neutralice la declaración de un testigo que es entera o parcialmente adverso. Si un testigo presta declaraciones hostiles a un acusado durante un juicio este último tiene una oportunidad para repreguntarlo. Pero si sus declaraciones prestadas en otra ocasión se presentan con el fin de probar algún elemento esencial de un delito se priva al acusado de esa oportunidad. Tal práctica está en pugna con la cuarta subdivisión del artículo 11 del Código de Enjuiciamiento Criminal, que dispone que en una acción criminal el acusado tiene derecho 'a confrontarse con los testigos contrarios en presencia del tribunal, excepto cuando se hubieren practicado las primeras diligencias ante un promotor Fiscal o juez de paz; o cuando el testimonio de algún testigo presentado por el pueblo, e imposibilitado de prestar fianza para su comparecencia, hubiere sido tomado en presencia del reo, quien en persona o por medio de su abogado hubiere repreguntado, o tenido oportunidad para repreguntar al testigo, en cuyo caso la deposición de éste podrá ser leída, siempre que se justificare a satisfacción del tribunal haber fallecido o estar demente dicho testigo, o no poderse encontrar en Puerto Rico, a pesar de las diligencias practicadas al efecto.''

Desde el 1917, la sección 2 del Acta Orgánica de Puerto Rico dispone, entre otras cosas, que en todos los procesos criminales el acusado gozará del derecho de carearse con los testigos de cargo. Antes de aprobarse el Acta Orgánica teníamos una disposición similar en el artículo 11 de los Estatutos Revisados de 1902. Carearse, en su aspecto prin-

cipal, no es otra cosa que el derecho de repreguntar. 12 C. J. 488, pár. 34. Wigmore on Evidence, tomo 2, párrafo 1365.

"Este derecho ha sido considerado siempre como uno de los más valiosos derechos del ciudadano. Lo protege contra el peligro de una convicción por declaraciones *ex-parte* o *affidavits* prestados en su ausencia, o cuando no tenía el derecho de la repregunta." 8 R.C.L. 85, *et seq.*

Véase además *El Pueblo* v. *Colón,* 25 D.P.R. 629; *El Pueblo* v. *Ríos,* 34 D.P.R. 555, *El Pueblo* v. *Maldonado,* 17 D.P.R. 23.

Al revocar una sentencia condenatoria por el delito de asesinato, en que se permitió al Estado usar un *affidavit ex-parte* en *Commonwealth* v. *Zorambo,* 205 Pa. 109, 55 Atl. 716, la corte dijo:

"Ni un *affidavit ex-parte* ni una deposición tomada regularmente pueden substituirse por declaraciones prestadas en presencia del acusado en un proceso criminal."

En el caso de *State* v. *Patton,* 164 S. W. 226, la corte, de un modo pintoresco, dijo:

"Equivaldría a presentar tanto al testigo mismo como su deposición tomada *ex-parte,* fuera de la presencia y oído del acusado, etc., haciendo así indirectamente que brotaran dos testigos donde anteriormente había uno."

Aunque tal vez la objeción no se presentó específicamente sobre tal extremo, las declaraciones de estos testigos eran meramente de referencia. Ni siquiera se llamó al taquígrafo para que identificara las declaraciones al tiempo de ser presentadas, aunque los autos demuestran que el fiscal presentó al taquígrafo posteriormente. El fiscal también nos llama la atención al hecho de que estas declaraciones escritas no fueron tomadas ante el fiscal en su capacidad de magistrado, sino ante el juez municipal.

[2] Se ha sugerido que la acción de la corte al admitir las declaraciones de Aurelio Rodríguez y Aurelio Cordero tomadas ante el juez municipal, en realidad no perjudicó al acusado. No hay duda de que tales declaraciones fueron admitidas indebidamente como prueba. En realidad, según hemos visto, las contradicciones contenidas en estos documentos no fueron muy fuertes. En uno de los casos se le preguntó al testigo acerca de su parentesco con el acusado; en el otro no se repreguntó en absoluto al testigo con respecto a los puntos en que se suponía que hubiera contradicción en las declaraciones prestadas previamente ante el juez municipal sobre las preguntas hechas por el fiscal. Sin embargo, estas declaraciones fueron ofrecidas por el Fiscal y admitidas por la corte bajo la única teoría de desacreditar las manifestaciones de los testigos y demostrar que ellos habían hecho declaraciones contradictorias. Fueron ofrecidas con rodeos, con el fin de demostrar que los testigos en realidad habían cometido el delito de perjurio. El jurado estaba presente. La oferta del fiscal y la acción de la corte fueron circunstancias poderosas de las cuales el jurado tenía derecho a inferir que dichos dos testigos no estaban diciendo la verdad. Hemos llamado la atención al hecho de que no se trató de contradecir uno de los testigos de cargo que declaró en igual forma, pero que fué repreguntado más detenidamente que cualquiera de los otros testigos respecto a manifestaciones contradictorias, y el efecto total en el jurado sería que no debía creerse ninguno de los testigos que había declarado a favor de la teoría de la defensa propia. Según hemos indicado antes en el caso de *El Pueblo* v. *Ramírez de Arellano,* 25 D.P.R. 263, si la evidencia ofrecida era inofensiva, ¿por qué el fiscal insistió en que fuera admitida? El debe haber tenido el propósito determinado de perjudicar la teoría de la defensa o de apoyar su caso, haciendo la oferta que hizo, la que la corte aceptó. De tole-

rarse una práctica como ésta, entonces las disposiciones del artículo 245 del Código de Enjuiciamiento Criminal se convertirían, en efecto, en letra muerta. Entonces, antes de poderse impugnar un testigo, no es necesario que "se le refieran dichas manifestaciones con expresión de la época, lugares y personas que hubieren estado presentes al hacerlas y se le pregunte si dichas manifestaciones fueron hechas por él, permitiéndosele que las explique, si contestare afirmativamente." El fiscal evidentemente creyó que estaba ayudando su caso y perjudicando al acusado, ofreciendo tal manifestación como prueba, y ése necesariamente fué el efecto que surtió en el jurado, si el caso se resolvió por las declaraciones de los tres testigos que hemos considerado.

Bajo el título "Apelación y Error," en 2 R.C.L. 235, pár. 196, hallamos lo siguiente:

"En caso de cometerse error en el curso de un juicio, las autoridades están en conflicto en cuanto a la presunción que surge respecto al efecto de tal error. Según parece ser la regla prevaleciente, la corte de apelación presumirá que tal error fué perjudicial, a menos que los autos demuestren lo contrario."

En las notas, se citan casos de la Corte Suprema de los Estados Unidos y de la Corte Suprema de California. Varios de ellos son civiles, pero de haber diferencia alguna, la presunción de error es mayor aún en un caso criminal, en que la convicción del acusado debe establecerse fuera de toda duda razonable. Para nosotros en Puerto Rico no es necesario adoptar una posición muy definida sobre esta cuestión hasta que haya sido analizada un poco más cuidadosamente por la profesión.

Creemos que en este caso no solamente el fiscal dejó de demostrar que no hubo perjuicio, sino que los autos demuestran que lo hubo. El fiscal de esta corte, lejos de pedir que se confirme la sentencia, sugiere que se revoque el caso.

No podemos convenir con el apelante en que la prueba no tendía a demostrar la comisión del delito, pero nos vemos obligados a resolver que la admisión de estas declaraciones fué un error perjudicial para el acusado, ya que tendían en la forma indicada a arrojar serias dudas sobre las declaraciones de estos testigos, quienes declararon a favor de la teoría de defensa propia y quienes no debe olvidarse fueron presentados por el fiscal.

El apelante también se queja de que la corte cometió error al imponerle la pena máxima de diez años. Sin embargo, si el acusado era culpable de homicidio voluntario, cometió el delito en forma tan viciosa, que estamos convencidos de que la corte estuvo justificada al imponerle el *máximum.*

*La sentencia debe ser revocada y devolverse el caso para la celebración de un nuevo juicio.*

El Juez Presidente Sr. del Toro disintió.

OPINIÓN DISIDENTE DEL JUEZ PRESIDENTE, SR. DEL TORO.

Disiento de la opinión de la mayoría. A mi juicio la admisión de las declaraciones escritas de los testigos Aurelio Cordero y Aurelio Rodríguez fué errónea, pero el error cometido no causó perjuicio al acusado y por tanto no lleva consigo la revocación de la sentencia apelada.

La admisión de las declaraciones lo fué después de haber el fiscal preguntado y repreguntado ampliamente a los propios testigos sobre las contradicciones entre su actual declaración y la prestada anteriormente ante dicho funcionario. Los testigos contestaron y explicaron. Sostuvieron que declararon lo mismo en ambas ocasiones. Fué entonces, si el interrogatorio no se conducía en forma legal, si no se mostraba a los testigos su declaración escrita pidiéndoseles que explicaran la contradicción, cuando la defensa debió intervenir. Los autos muestran que sólo lo hizo en una oca-

sión—pág. 49—pero que recibida cierta explicación del juez, se conformó aparentemente y no tomó excepción.

Quiere decir que si algún perjuicio pudo recibir el acusado lo fué en el primer momento y no puede quejarse porque su abogado no tomó excepción.

Basta leer la forma en que la excepción fué finalmente formulada para concluir que el abogado del acusado se opuso basándose sólo en la pureza del procedimiento, no porque temiera perjuicio alguno para el acusado. Y se comprende perfectamente su actitud. Si se leen las declaraciones escritas se concluirá en seguida que en vez de perjudicar favorecen al acusado.

Puede afirmarse a virtud de un examen concienzudo de la prueba que ninguna influencia tuvo en el veredicto la admisión final de las declaraciones. El Jurado pudo dar entero crédito a las declaraciones de los dos Aurelios y sin embargo declarar como declaró culpable al acusado, no ya de homicidio; de asesinato. El Jurado pudo admitir la existencia al comenzar el encuentro de una lucha y sin embargo concluir a virtud del examen del cuerpo de Laureano González hecho a través de la declaración del doctor Fiol, que no se trataba de una muerte excusable.

El doctor practicó la autopsia de Laureano González, la persona a quien dió muerte el acusado, y encontró en su cuerpo tres heridas cortantes y ocho agujeros de bala, cinco de entrada y dos de salida. "Tenía", dijo el doctor, refiriéndose a las heridas de arma de fuego, "un orificio de entrada en la región braqueal derecha con agujero de salida en la axila derecha; había otra en la región pectoral, que atravesó el corazón, que no tenía agujero de salida; tenía otra en la región pectoral también del lado opuesto, o sea la derecha, que salió por el hipocondrio izquierdo, y había una que entró por la espalda y casi salió por delante." Y luego, contestando a preguntas del propio abogado defensor

con respecto a la posición del acusado en relación con su adversario al inferirle la última de las heridas descritas, expresó:

"Siempre por detrás, el agresor detrás y el agredido delante, si le ha tirado de pie, pero si le ha tirado en el suelo en cualquier posición en el suelo, le pudo tirar estando hacia delante o hacia atrás, en la cabeza o a los pies."

    *         *         *         *         *         *         *

"Si le ha dado de pie le ha dado por la espalda, y si se le ha dado en el suelo, un hombre en el suelo no está delante ni atrás, está en el suelo."

    *         *         *         *         *         *         *

"Es claro, o de espalda también, este hombre ha quedado de espaldas y le ha dado el tiro en el suelo, o se lo dió de espaldas estando en el suelo, o se lo dió de pie estando de espaldas."

El acusado no recibió herida alguna. Declaró extensamente en el juicio. Su declaración sobre este extremo, contestando al fiscal, es como sigue:

"Fiscal—¿Dice que él comenzó a agredirle con la daga?
Testigo—Sí, señor.
Fiscal—¿Lo hirió él a usted?
Testigo—Yo no me fijé bien, porque después que lo ví a él tendido en el suelo . . . . .
Fiscal—¿Que si lo hirió a usted?
Testigo—No, señor."

Siendo ello así, en bien de la justicia, no pudiendo percibir que exista nada que demuestre que el acusado no fuera juzgado por un jurado imparcial, de acuerdo con el espíritu que informa la ley relativa a la revocación de sentencias en causas criminales aprobada en 1904 y enmendada en 1905, —Compilación 1911 p. 1049,—opino que debe confirmarse la sentencia recurrida.