EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* ALEJANDRO LEBRÓN (*a*) TITO, acusado y apelante.

Núm. 9316.—*Sometido:* Enero 26, 1943. *Resuelto:* Marzo 29, 1943.

*F. García Quiñones,* abogado del apelante; *R. A. Gómez, Fiscal del Tribunal Supremo,* abogado de El Pueblo, apelado.

El Juez Asociado Señor De Jesús emitió la opinión del tribunal.

El apelante fué convicto de los delitos de asesinato en segundo grado y portar armas prohibidas y sentenciado a cumplir diez años de presidio y tres meses de cárcel, respectivamente. No negó haber dado muerte al interfecto; pero alegó haberlo hecho en defensa propia. La naturaleza de los errores que a la corte inferior imputa el apelante, requiere que para la mejor inteligencia de la discusión hagamos un resumen de la prueba de una y otra parte así como una relación de los procedimientos que tuvieron lugar desde que el acusado fué convicto de ambos delitos el 17 de enero de 1941 hasta que se le impuso la pena el 3 de octubre de 1941 en el caso *felony* y el 10 del mismo mes en el *misdemeanor*.

La teoría del fiscal puede resumirse así: Allá por el 5 de octubre de 1940, el acusado, el interfecto, un tal Williams y otros, se hallaban en un patio de una casa de la calle Cerra, de Santurce, jugando un juego de naipes denominado "treinta y una". Williams se dispuso a retirarse y como el interfecto le debía 12 centavos con motivo del juego, solicitó de éste que se los pagara antes de marcharse. El interfecto, alegando no tener dinero, indicó al acusado que pagase a Williams los 12 centavos que el acusado adeudaba al interfecto por idéntico concepto. Esta indicación del interfecto dió motivo a ciertas palabras entre él y el acusado, quien se puso de pie e hizo ademán de sacar un arma para atacar al interfecto. En vista de la actitud del acusado, el interfecto, armado de una silla, agredió con ella por la cabeza al acusado, produciéndole una herida en el cráneo y derribándolo como resultado de la agresión. Intervinieron las personas allí presentes para evitar que continuara la riña y una de ellas,

Lorenzo Vélez, lavó la herida del acusado y lo condujo a casa de éste. El interfecto también se marchó a la suya, en la misma calle Cerra, cerca de la del acusado. Luego que el interfecto hubo comido en su casa y cambiádose de ropas, fué a visitar a su novia que también vivía en la calle Cerra, cerca del interfecto y del acusado. Mientras esto ocurría el acusado salió de su casa armado de un cuchillo y entró en el cafetín de Ramón Avilés, también en la calle Cerra, muy cerca de la casa de la novia del interfecto. Después de comprar allí cigarrillos, se situó en la puerta del establecimiento y al notar que el interfecto se hallaba junto a a verja de la casa de su novia hablando con ésta, lo llamó. Correspondió él a la llamada y se dirigió hacia el acusado, quien sin mediar palabras lo atacó con el cuchillo que portaba, cayendo inmediatamente el interfecto, para morir pocas horas después a consecuencias de la herida recibida.

. La teoría de la defensa, en síntesis, es la siguiente: El día de autos el acusado se hallaba comiendo en su casa. El interfecto, a quien el acusado debía 12 centavos que aquél le había prestado anteriormente, fué por el patio del acusado y lo llamó. El acusado fué donde el interfecto y éste le pidió que le pagase los 12 centavos que le debía, pero como el acusado no tenía a la sazón menudo, le mostró un billete de un dólar y le indicó que esperase a que lo cambiase. Volvió la espalda el acusado y el interfecto en ese momento cogió una silla y le infirió con ella dos golpes en el cráneo, cayendo herido el acusado. Le lavaron la herida en su casa y como brotaba mucha sangre, decidió ir a curarse al Cuarto de Socorros en la parada 17. En esos momentos ya el acusado tenía conocimiento de que el interfecto había manifestado su propósito de quitarle la vida. Mientras se dirigía al Cuarto de Socorros, entró al cafetín de Ramón Avilés, compró cigarrillos y le dió uno a un amigo que encontró allí, a quien le relató lo que le había sucedido con el interfecto. El amigo se brindó para acompañarlo al Cuarto de Socorros, pero el

acusado·lo rehusó. No había dado dos pasos fuera del cafetín cuando se encontró con el interfecto que estaba parado por allí. Inmediatamente el interfecto le tiró un puntapié y el acusado echó hacia atrás, pero al ver que el interfecto sacó del seno un arma y le acometió varias veces con ella, el acusado, creyendo que el interfecto lo iba a matar, lo atacó una sola vez con un cuchillo que traía de su casa, produciéndole la herida fatal.

Desde que se inició el juicio por asesinato hasta que el jurado rindió el veredicto el 17 de enero de 1941, presidió el tribunal el entonces juez de la corte inferior Hon. R. H. Todd, Jr. Al mismo tiempo, por estipulación de las partes, el caso de portar armas fué sometido al mismo juez por la evidencia que habría de someterse en el de asesinato. El Juez Sr. Todd recibió el veredicto y declaró al acusado convicto del delito de asesinato en segundo grado. Al mismo tiempo, por el mérito de la prueba presentada en el caso de asesinato, declaró al acusado culpable del delito de portar armas prohibidas. En ambos casos la imposición de la pena fué señalada para el día 24 de enero de 1941, ya que el acusado solicitó que se pospusiese hasta entonces la correspondiente al de portar armas.

Antes de la fecha señalada para la imposición de la pena en ambos casos, el acusado solicitó y obtuvo permiso para presentar una moción de nuevo juicio. Esta circunstancia dejó sin efecto el señalamiento que se había hecho para el 24 de enero en el caso de asesinato y como el de portar armas había sido sometido por la misma prueba, sin duda estimó el juez que en este último era conveniente dejar pendiente la imposición de la pena hasta que se resolviese la moción de nuevo juicio en el caso de asesinato. Pero el Juez Sr. Todd fué nombrado Juez Asociado de este Tribunal el 20 de febrero y al siguiente día tomó posesión de su cargo, y por consiguiente no pudo imponer las sentencias en los referidos casos. El día 3 de octubre de 1941, otro de los jue-

ces de la corte inferior, el Hon. Marcelino Romany, dictó una resolución por la que declaró sin lugar la moción de nuevo juicio en el caso de asesinato e inmediatamente impuso al acusado la pena de diez años de presidio por dicho delito. En cuanto al de portar armas prohibidas, creyendo erróneamente el Juez Romany que el Juez Todd no había hecho pronunciamiento alguno, de su propia iniciativa ordenó que se celebrase un nuevo juicio, para lo cual señaló el 10 de octubre de 1941, ante otro juez de la misma corte que para aquella fecha entendía de los casos *misdemeanors*. En dicho día, enterado por la minuta del 17 de enero de 1941 que el Juez Todd había declarado al acusado culpable del delito de portar armas prohibidas y que sólo estaba pendiente de la imposición de la pena, dejó sin efecto la orden concediendo el nuevo juicio y estando presentes el acusado y su abogado, sentenció al acusado a la pena de tres meses de cárcel, sin costas.

Sostiene el apelante que no habiéndose celebrado el juicio por asesinato ante el Juez Romany, carecía éste de jurisdicción para la imposición de la pena. Ninguna autoridad cita en apoyo de su proposición. Ya hemos expuesto las razones que impidieron al Juez Todd imponer la pena en ambos casos.

Es la mejor práctica que el juez que empieza un juicio y oye la prueba dicte la sentencia correspondiente, pero dada la situación extraordinaria que se creó con el nuevo nombramiento del juez que conoció del caso y no causándose perjuicio alguno al acusado al ser sentenciado por un juez de la misma corte ante quien no se celebró el juicio, la actuación de dicho juez al imponer la pena en uno y otro caso es perfectamente válida.

En la obra *American Law Reports*, tomo 114, pág. 435, se encuentra una extensa monografía en la que se hace un cuidadoso estudio de la materia y se clasifican y analizan un considerable número de casos tanto federales como estatales.

Todos están de acuerdo en que si bien es una práctica que no debe alentarse, sin embargo cuando concurren como en este caso circunstancias extraordinarias que impiden al juez que empezó el juicio dictar la sentencia, si el dictarla otro juez no causa perjuicio al acusado, la sentencia es válida.

Que en el caso de asesinato no pudo perjudicarse al acusado lo evidencia el hecho de que la pena que le fué impuesta es la mínima que para dicho delito señala la ley. El Juez Todd bajo ninguna circunstancia podía imponerle una pena menor de la de diez años de presidio. No queremos decir con esto que para que se entienda que no hubo perjuicio al acusado el juez que sustituye a otro venga obligado en todo caso a imponer el mínimo de la pena. Es su deber examinar toda la prueba para ponerse en condiciones de ejercitar su discreción en la imposición del castigo. En el caso de portar armas prohibidas el juez sentenciador no le impuso el mínimo de la pena; pero su resolución denegando la moción de nuevo juicio en el de asesinato, revela el cuidadoso estudio que hizo de la prueba antes de imponer la pena en uno y otro caso.

■■■ Se queja el apelante de que la sentencia dictada el 10 de octubre de 1941 en el caso de portar armas prohibidas lo fué después que el propio Juez Romany había ordenado un nuevo juicio y que por esta razón no es válida. Ya hemos explicado antes el error que sufrió el Juez Romany al ordenar la celebración de un nuevo juicio bajo la impresión de que el Juez Todd no había declarado al acusado culpable de dicho delito. Descubierto el error, actuó dentro de las facultades que a todo juez concede el artículo 7 del Código de Enjuiciamiento Civil para corregir sus órdenes y providencias de manera de ajustarlas a la verdad y a la justicia. Según alega el apelante, al llamarse el caso el 3 de octubre de 1941, el cusado alegó que el Juez Romany no tenía jurisdicción para dictar sentencia por no haber sido el juez ante quien se celebró el juicio, y el día 10 de octubre siguiente,

al volverse a llamar el caso para la imposición de la pena, alegó también falta de jurisdicción por haber transcurrido con exceso, según el apelante, el término legal para dictarla. Ya hemos dicho que dadas las circunstancias extraordinarias que concurrieron en este caso, no existió razón legal alguna que impidiese al Juez Romany dictar sentencia por el hecho de no haberse celebrado el juicio ante él. En cuanto al supuesto término legal para dictarla, parece que el apelante cree ser de aplicación a este caso el párrafo 5 del artículo 29 del Código de Enjuiciamiento Criminal que fija un término de dos días dentro del cual la corte de distrito deberá dictar sentencia en los casos criminales apelados ante ellas. El caso de portar armas se originó, de acuerdo con la ley, en la propia Corte de Distrito y por consiguiente no es de aplicación el citado precepto legal.

■ Llama la atención en estos dos casos el hecho de haber transcurrido unos ocho meses desde que el acusado fué convicto el 17 de enero de 1941 hasta que fué sentenciado el 3 de octubre de 1941 en el caso *felony* y el 10 del mismo mes en el de portar armas. No encontramos nada en el récord que justifique esa dilación, aparte de la moción de nuevo juicio presentada en el caso *felony;* pero sea como fuere, no consta de los autos que en momento alguno el acusado hubiere, antes de dichas fechas, insistido en que se impusiese la pena correspondiente. Siendo ello así, su derecho a que las sentencias fuesen dictadas dentro de un plazo razonable, debe entenderse renunciado, y la corte conservó su jurisdicción para dictarlas no obstante haber transcurrido un término mayor que el razonable. *Zerbst* v. *Nahas* (1933) 67 Fed. (2d) 742. Al mismo efecto, véase *Miller* v. *Aderhold,* 288 U. S. 206, 77 L. ed. 702.

■ Resueltas ya las cuestiones jurisdiccionales suscitadas por la defensa, pasemos ahora a considerar los errores que se imputan a la corte sentenciadora en relación con las siguientes instrucciones:

"1. Para reducir el delito de asesinato al de homicidio debe mediar una provocación suficiente para producir una pasión irresistible en una persona de ordinario dominio sobre sí misma. La provocación que la ley estima suficiente para reducir el delito de asesinato a homicidio debe ser notable y es necesario, además, que esa provocación haya producido en el matador un arrebato de cólera y que única y exclusivamente por ese arrebato de cólera es que el acusado ha dado muerte a la persona que se dice haber sido matada. Si esa provocación no ha producido un arrebato de cólera y se da muerte por algún otro motivo que no haya sido esa provocación, entonces existe la malicia.

"2. Debo decirles, ampliando esta cuestión un poco, aunque no se ha entrado en el análisis de la prueba, de que para determinar si este acusado actuó o no en defensa propia al herir a Tomás López, ustedes deben resolver si él actuó en defensa propia de acuerdo con los hechos que ocurrieron en el momento en que él infirió la herida a Tomás López. La prueba ha tendido a demostrar que hubo un incidente entre Tomás López y el acusado bien en el patio de la casa, según dicen los testigos de la defensa, o en una jugada, según dicen los testigos de cargo, con motivo de unas palabras por el cobro de doce centavos y que Tomás López le dió con una silla al acusado y lo tumbó al suelo y lo recogieron y se lo llevaron y después que estuvo en su casa, que estuvo en un cafetín y al salir del cafetín fué que se encontró con Tomás López de nuevo. Estos primeros hechos no pueden servir de base para determinar si el acusado actuó en defensa propia. El acusado dice que en el segundo encuentro Tomás López sacó un cuchillo y le dió unas patadas y que entonces en defensa propia él sacó el cuchillo y le dió. Es en cuanto a este segundo encuentro que tienen que determinar si el acusado actuó o no en defensa propia. En otras palabras, ninguna persona, ni este acusado, por el hecho de que le den ahora un silletazo o lo que sea puede dejar pasar ese momento y después un cuarto de hora, media hora, o una hora después sale y ataca al que lo agredió, y decir entonces que actuó en defensa propia porque le dió el silletazo. Si el acusado le hubiera dado la puñalada cuando el silletazo, entonces podría determinarse si actuó o no en defensa propia. La teoría del acusado fué que él actuó en defensa propia en el segundo encuentro y lo dicen sus testigos porque Tomás López volvió después de haberle dicho a uno de los testigos de que si encontraba a Tito lo iba a matar y que el acusado al verse agredido de nuevo fué que sacó el arma y lo mató.

"3. La declaración prestada por el acusado debe interpretarse y tomarse en consideración en todo aquello que pueda favorecerle en cuanto a su credibilidad y que fué a los fines en que fué admitida la declaración del acusado.

"4. Un acusado puede declarar o no, según lo desee. En el caso presente, el acusado ha declarado y su testimonio deben tomarlo en consideración como el de cualquier otro testigo.

"5. A ustedes toca determinar si se ha establecido la defensa propia. Debo decirles, ampliando esta cuestión un poco, aunque no se ha entrado en el análisis de la prueba, de que para determinar si este acusado actuó o no en defensa propia al herir a Tomás López, ustedes deben resolver si él actuó en defensa propia de acuerdo con los hechos que ocurrieron en el momento en que él infirió la herida a Tomás López. La prueba ha tendido a demostrar que hubo un incidente entre Tomás López y el acusado bien en el patio de la casa, según dicen los testigos de la defensa, o en una jugada, según dicen los testigos de cargo, con motivo de unas palabras por el cobro de doce centavos y que Tomás López le dió con una silla al acusado y lo tumbó al suelo y lo recogieron y se lo llevaron y después que estuvo en su casa, que estuvo en un cafetín y al salir del cafetín fué que se encontró con Tomás López de nuevo. Estos primeros hechos no pueden servir de base para determinar si el acusado actuó en defensa propia. El acusado dice que en el segundo encuentro Tomás López sacó un cuchillo y le dió unas patadas y que entonces en defensa propia él sacó el cuchillo y le dió. Es en cuanto a este segundo encuentro que tienen que determinar si el acusado actuó o no en defensa propia. En otras palabras, ninguna persona, ni este acusado, por el hecho de que le den ahora un silletazo o lo que sea puede dejar pasar ese momento y después un cuarto de hora, media hora, o una hora después sale y ataca al que lo agredió, y decir entonces que actuó en defensa propia porque le dió el silletazo. Si el acusado le hubiera dado la puñalada cuando el silletazo, entonces podría determinarse si actuó o no en defensa propia. La teoría del acusado fué que él actuó en defensa propia en el segundo encuentro y lo dicen sus testigos porque Tomás López volvió después de haberle dicho a uno de los testigos que si encontraba a Tito lo iba a matar y que el acusado al verse agredido de nuevo fué que sacó el arma y lo mató."

La primera de las instrucciones impugnadas no va dirigida, como erróneamente cree la defensa, a ilustrar al ju-

rado sobre las distintas modalidades del homicidio voluntario. Su propósito fué explicarles la circunstancia bajo la cual un acto delictivo que de otro modo constituiría asesinato se reduce al de homicidio voluntario. Esa circunstancia existe cuando, como dice la corte inferior, ha mediado una provocación suficiente para producir una pasión irresistible en una persona de ordinario dominio sobre sí misma. La provocación no sólo debe haber existido, si que también haber causado la súbita pasión bajo el influjo de la cual se cometió el delito. Si no existe esa provocación o si habiendo existido no es lo suficientemente grave y la actuación del matador está fuera de toda proporción con el grado de la provocación, el acto de dar muerte constituye asesinato aunque el acusado no hubiese preconcebido la intención de matar. Para un amplio estudio de esta materia, véase la monografía que aparece en 5 L.R.A. (N. S.) 809. Está sin duda equivocada la defensa al creer que procedía hacer referencia dentro de esta instrucción a la muerte que se causa durante una súbita pendencia. Cuando existe una súbita pendencia y como resultado de la misma uno de los contendientes es privado de la vida, en ese caso, salvo excepciones que no concurren aquí, como cuando el acusado provoca la contienda como un pretexto para matar a la víctima, el único delito que se comete es el de homicidio y por consiguiente no sería correcto y tendería a confundir al jurado en perjuicio del propio acusado, el referirse al delito de asesinato no justificando la evidencia una instrucción sobre ese delito.

En otra instrucción que no es impugnada ahora por la defensa se ilustró al jurado sobre lo que constituye el delito de homicidio y se hizo referencia entonces a la súbita pendencia como una de las modalidades de ese delito. No se hizo entonces referencia a si desde el primer incidente—en que resultó herido el acusado—hasta que tuvo efecto el segundo—en que fué muerto el interfecto—había transcurrido o no tiempo razonablemente suficiente para calmar la pasión

que al acusado debió producir el primer encuentro, o sea la doctrina que en inglés se conoce con el nombre de *cooling time*. Esa instrucción era innecesaria en este caso en vista de la posición asumida por el acusado al efecto de que causó la muerte en defensa propia y no bajo influencia de un arrebato de cólera o súbita pasión producida por la herida que poco antes recibiera de manos del interfecto.

A nuestro juicio la primera instrucción es correcta. Consideremos la segunda.

██ Fué incompleta la instrucción de la corte al decirle al jurado que en relación con la defensa propia alegada por el acusado no debían ellos tener en cuenta el incidente que una hora antes había tenido lugar entre el interfecto y el acusado en el cual aquél agredió a éste en la forma que ya conocemos. Es obvio que al tener lugar una hora después el segundo incidente, ya había cesado el peligro inminente de perder la vida o recibir grave daño corporal en que pudo entonces haberse encontrado el acusado. Siendo ello así, no podía alegar con éxito que un peligro que ya no existía lo colocó en la imperiosa necesidad de matar a su anterior agresor. Pero la prueba del acusado tendió a demostrar que había sido advertido de que el interfecto había manifestado su intención de quitarle la vida, y en el segundo encuentro el interfecto, sin mediar provocación, le dió un puntapié primero y en seguida lo acometió dos veces con un cuchillo que portaba. El acusado ofreció en evidencia un cuchillo, alegando que era el mismo con que había sido acometido por el interfecto. Si el jurado daba crédito a esa prueba, era lógico que también tuviese en cuenta lo sucedido en el primer incidente, ya que el conocimiento que en aquella ocasión adquirió el acusado de lo que podía ser capaz el interfecto era un elemento a considerar por el jurado para determinar si el acusado tuvo razón para creer que al dar muerte al interfecto se hallaba en inminente peligro de perder la vida o recibir grave daño corporal.

Al excepcionar el acusado la indicada instrucción, la corte rectificó en los siguientes términos:

"No he dicho que no haya relación entre un incidente y otro. Yo quiero decir que la teoría del acusado es que no actuó por lo del primer incidente, sino porque en el segundo incidente Tomás López lo volvió a agredir con los pies y sacó un arma. El primer incidente deben tomarlo para considerar toda la situación del caso. Todos los hechos del caso están ante la consideración del jurado y pueden tomarlo en consideración para los efectos de si es cierto que Tomás López lo volvió a agredir en la segunda ocasión."

La instrucción adicional, a nuestro juicio, subsanó el defecto de la originalmente transmitida, ya que en la misma se expresa que el incidente "deben tomarlo para considerar toda la situación del caso", y a continuación vuelve a decir que pueden tomarlo en consideración "para los efectos de si es cierto que Tomás López lo volvió a agredir en la segunda ocasión." Si bien el lenguaje usado en esta última manifestación de la corte no es todo lo claro que debió ser, puede fácilmente inferirse que lo que quiso decir es que podían tomarlo en consideración en caso de que estimaren cierto que Tomás López volvió a agredirlo en la segunda ocasión. Claro es que si Tomás López no volvió a agredir al acusado en la segunda ocasión, no había posibilidad de considerar la alegada defensa propia.

En relación con la instrucción que nos ocupa, se queja el acusado de que "después de haberse estipulado por la defensa y el fiscal que no se entrara en el análisis de la prueba", la corte, ello no obstante, hizo un breve resumen de la presentada por una y otra parte.

Esa estipulación, aunque en verdad existió, no podía relevar a la corte del deber imperativo impuéstole por el inciso 8 del artículo 233 del Código de Enjuiciamiento Criminal, que dice así:

"Art. 233.         .         .         .         .         .

"8. Entonces el juez (terminados los informes), en corte abierta y a presencia de las partes y de los abogados, hará un resumen del

caso, omitiendo todas las circunstancias superfluas, llamando la atención del jurado hacia la cuestión esencial a resolver y puntos principales en discusión, expresando cuál ha sido la prueba practicada para sostenerlos, con las observaciones que estime necesarias para el gobierno del jurado, y expresando su opinión solamente sobre las cuestiones de derecho que surjan de la prueba.'' (Paréntesis nuestro.)

La práctica de omitir el juez hacer el resumen de la prueba, no sólo es contraria al precepto expreso de la ley, si que perjudicial a los fines de la justicia. La razón por la cual debe hacerse un resumen de la prueba es, como dice el precepto transcrito, traer a la atención del jurado los hechos esenciales presentados por una y otra parte. En otras palabras, separar la paja del grano, evitando así que el jurado pueda ser inducido a error o confusión al tomar en cuenta hechos que son inmateriales para la resolución del caso. Es más, el juez en sus instrucciones no debe transmitir la ley en abstracto. El jurado se compone de personas legas en materia de Derecho y transmitirles la ley en esa forma, equivale a poner en sus manos los estatutos para que ellos resuelvan el caso de acuerdo con la interpretación que crean más correcta. Por eso la mejor práctica es, después de hacer el resumen, exponer al jurado las distintas conclusiones a que pueden llegar en la apreciación de la prueba e indicarles entonces el veredicto que proceda de acuerdo con cada una de dichas conclusiones. De esa forma la misión del jurado queda circunscrita a sus verdaderos límites, es decir a determinar las cuestiones de hecho, y se evita que a pesar de estar todos de acuerdo en cuanto a los hechos, incurran en error en la aplicación de la ley. No existe, a nuestro juicio, el error imputado en relación con la instrucción que acabamos de discutir.

■ La tercera instrucción impugnada es errónea, pero el error no es perjudicial al acusado. Conforme aparece de la prueba, el fiscal en el acto del juicio ofreció en evidencia y fué admitida la declaración que prestó el acusado la noche

de autos ante dicho funcionario. Esta declaración fué ofrecida para impugnar el testimonio oral que había dado en el acto del juicio el acusado. La corte equivocadamente en esta instrucción les dice al jurado que deben tomar esa declaración "en consideración en todo aquello que pueda favorecerle en cuanto a su credibilidad y que fué a los fines en que fué admitida la declaración del acusado." Si esta declaración ha de tomarse en consideración solamente en cuanto favorezca al acusado, no hay duda que tal instrucción, si bien es errónea, no pudo en manera alguna perjudicarle.

La cuarta instrucción impugnada es también deficiente. En ella se instruye al jurado que el testimonio del acusado deben tomarlo en consideración como el de cualquier otro testigo. Hasta ahí está correcta. Pero faltó algo más, o sea que al considerar la declaración del acusado debe tenerse en cuenta el interés que todo acusado naturalmente tiene en su propia causa. Sin embargo, esa deficiencia, lejos de perjudicarle, favoreció al acusado, puesto que de acuerdo con ella debía considerársele como a un testigo que no tiene interés alguno en el asunto sobre el cual declara.

Otro de los errores señalados por el apelante es al efecto de que la corte sostuvo que el fiscal había hecho en debida forma las advertencias legales al acusado al tomarle la noche de autos la declaración que en el acto del juicio presentó el fiscal en evidencia para contradecir el testimonio del acusado. Sin duda el apelante se refiere a las advertencias que es costumbre en esta jurisdicción hacer a todo acusado cuando se le toma declaración en la investigación del delito, a saber: que está acusado de un delito, que tiene el derecho de declarar o no declarar, y que si declara su testimonio puede ser usado en contra suya. Esas advertencias fueron oportunamente hechas, conforme aparece de la propia declaración jurada presentada y admitida en evidencia. Sin embargo, parece conveniente decir una vez más que tales advertencias no son necesarias para que la declaración sea admi-

sible en evidencia. Tanto el artículo 2 de la Ley Orgánica como el 7 del Código de Enjuiciamiento Criminal sólo garantizan a un acusado el derecho de no ser obligado a declarar en contra suya. Desde hace más de treinta y seis años la jurisprudencia constante de este tribunal, interpretativa del citado precepto legal, viene sosteniendo que el único requisito para que dicha declaración sea admisible en evidencia es que haya sido prestada voluntariamente. *Pueblo* v. *Kent,* 10 D.P.R. 343, 370; *Pueblo* v. *Martínez,* 23 D.P.R. 228; *Pueblo* v. *Rodríguez,* 28 D.P.R. 501; *Puebl.o* v. *Colón,* 39 D.P.R. 904, 906; *Pueblo* v. *Saldaña,* 40 D.P.R. 580, 581; y *Pueblo* v. *Méndez,* 54 D.P.R. 195.

En el caso de autos la declaración del acusado, ofrecida en evidencia para impugnar su testimonio en el juicio, fué prestada voluntariamente y por lo tanto no era inadmisible por ese motivo.

En el acto del juicio el fiscal, con el fin de impugnar el testimonio de Marcelina Alicea, esposa del acusado, le interrogó en relación con la declaración jurada que ella había prestado ante él la noche de autos. No se mostró a la testigo el escrito contentivo de dicha declaración, y tanto las repreguntas del fiscal, que contenían lo dicho en tal declaración jurada, como las contestaciones de la testigo negando o diciendo que no recordaba haber hecho tal manifestación, fueron consignadas en el récord taquigráfico, a pesar de que la declaración escrita en ningún momento fué ofrecida en evidencia. Sin duda el procedimiento seguido por el fiscal para impugnar el testimonio oral de esta testigo no fué el prescrito por la ley. El artículo 245 del Código de Enjuiciamiento Criminal y el 159 de la Ley de Evidencia, que son iguales, dictan el procedimiento a seguir para impugnar el testimonio oral de un testigo mediante declaración escrita que hubiera prestado anteriormente. El escrito por medio del cual se trata de contradecir al testigo debe mostrársele antes de ser interrogado en relación con el mismo. El propósito para el cual exige la ley que se le muestre su declaración

escrita antes de interrogársele sobre su contenido es para que el testigo pueda leerla o pueda serle leída, y una vez enterado de su contenido, deberá preguntársele si lo escribió o firmó, y si lo admite, debe llamársele entonces la atención a las contradicciones o inconsistencias que pudieran existir entre la primera declaración y el testimonio oral, permitiéndole también relatar los hechos o circunstancias que expliquen o reconcilien las manifestaciones inconsistentes o que demuestren la relación de unas y otras entre sí y el significado y propósito de las mismas. Admitida por el testigo la autenticidad de la declaración escrita, se ofrecerá en evidencia, y una vez admitida, debe ser leída al jurado como la mejor evidencia de lo que el escrito contiene. De esa forma puede el jurado determinar por sí mismo si en efecto existe o no la contradicción y dar al testimonio oral el crédito que merezca. Si el testigo negare haber escrito o firmado tal declaración, entonces puede probarse su autenticidad y se ofrecerá en evidencia. Admitido el documento, se leerá al jurado como en el caso de haberse aceptado la autenticidad. Véanse *Pueblo* v. *Rodríguez*, 36 D.P.R. 427, y *Pueblo* v. *Lafontaine*, 43 D.P.R. 23, 26.

En el caso de autos el fiscal, sin que la testigo en ningún momento admitiese que el escrito que él tenía en sus manos fuese su declaración, aparentemente leyendo de la misma, se limitó a preguntarle más o menos en la siguiente forma: ¿No es cierto que usted en la declaración prestada el 5 de octubre de 1940 declaró tal y cual cosa? La testigo unas veces negaba y otras decía que no recordaba haber dicho entonces lo que el fiscal ponía en boca de ella. La defensa objetó oportunamente, pero su objeción fué desestimada y tomó excepción.

Es obvio que el fiscal al así proceder estaba haciendo indirectamente lo que la ley le prohibía hacer de un modo directo, pues sin haber presentado en evidencia la declaración escrita estaba vaciando en el récord su contenido y llevándola

al conocimiento del jurado. Pero el error así cometido no fué perjudicial a los derechos sustanciales del acusado. En la supuesta declaración prestada la noche de autos, la testigo decía que el acusado al llegar a su casa después de ocurrido el primer incidente en que resultó herido, cogió allí un cuchillo. En el examen oral la testigo dijo que ella no vió que él cogiera tal cuchillo en su casa. El propio acusado declaró en el acto del juicio que él salió de su casa llevando el cuchillo y que lo llevaba consigo a pesar de que iba con el propósito de curarse, temeroso de que el interfecto lo fuese a matar. (T. de E., pág. 71.) Siendo ello así, ¿qué materialidad tenía que la esposa declarase que no vió que el acusado al salir de su casa después de haber sido herido, se armase del cuchillo, si el propio acusado lo había admitido?

Dicho error, si bien existió, no perjudicó los derechos sustanciales del acusado. Por tanto, no motiva la revocación de la sentencia.

██ El acusado no apeló de la resolución denegatoria de la moción de nuevo juicio. Por consiguiente, carecemos de jurisdicción para revisarla. Véase *Pueblo* v. *Mediavilla,* 54 D.P.R. 565.

La improcedencia de los restantes señalamientos de error es tan manifiesta que su discusión en esta opinión resulta tan innecesaria como inútil.

*Procede confirmar las dos sentencias apeladas.*

El Juez Asociado Sr. Todd, Jr., no intervino.