EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JOSÉ MERCEDES TIRADO y BERNARDO RODRÍGUEZ, acusados y apelantes.

Núm. 13338.—*Sometido:* Noviembre 12, 1948.   *Resuelto:* Noviembre 26, 1948.

390

*F. Hernández Vargas,* abogado de los apelantes; *Hon. Procurador General Luis Negrón Fernández y J. Rivera Barreras, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

José Mercedes Tirado y Bernardo Rodríguez fueron acusados de asesinato en primer grado. Se les juzgó ante jurado, siendo declarados culpables de asesinato en segundo grado y sentenciados a cumplir una pena de diez a quince años de presidio.

En apelación los acusados alegan que la corte inferior cometió error al negarse a instruir al jurado como cuestión de derecho que el testigo Francisco Galíndez era un cómplice, y por consiguiente que no podía declarárseles culpables sin que el testimonio de dicho testigo fuera corroborado, a tenor con el artículo 253 del Código de Enjuiciamiento Criminal, ed. de 1935.

██ Galíndez declaró que tomó parte en ciertas etapas del supuesto crimen junto a los dos acusados, pero que actuó así porque ellos lo amenazaron de muerte si no los ayudaba. La corte inferior instruyó al jurado al efecto de que si creían que Galíndez actuó bajo coacción, entonces éste no era un cómplice y su declaración no tenía que ser corroborada; pero que si no creían que actuó bajo coacción, éste entonces era un cómplice y se necesitaba la corroboración de su testimonio antes de que se pudiera declarar culpables a los acusados. Toda vez que hubo alguna prueba en cuanto a coacción, ésta hubiera sido una instrucción adecuada en cualquier caso menos en asesinato en primer grado. *Robinson* v. *State,* 148 S.W.2d 1115 (Tex., 1941). Sin embargo, la instrucción fué errónea porque la defensa de coacción no puede alegarse por una persona que participa en actos que dan lugar a una acusación de asesinato en primer grado.

El artículo 39(10) del Código Penal, ed. de 1937, prescribe como sigue:

"Todas las personas son capaces de cometer crímenes, excepto los pertenecientes a las siguientes clases:

"* * * * * * *

"Las personas que cometieren el acto o incurrieren en la omisión, bajo tales amenazas, que tenían motivos suficientes para creer, y en realidad creyeren, que peligraban sus vidas, de negarse a cometerlo, excepto en los casos de crímenes castigados con la pena de muerte."

█ El fiscal de este Tribunal arguye que la excepción contenida en el párrafo 10 es académica, ya que por ley insular la pena de muerte no existe ahora en la isla para nin-

gún crimen. Pero esta exepción debe leerse a la luz de nuestra ley estatutaria cuando fué aprobada en 1902. Para esa época el asesinato en primer grado era, con una excepción poco común, el único delito insular castigado con la pena de muerte. Artículo 202, Código Penal.(¹) Y en California y generalmente a través de todos los Estados Unidos, tanto en la Ley Común como mediante estatutos, la coacción es una defensa excepto en casos de asesinato. *People* v. *Petro,* 56 P.2d 984 (Calif., 1936); Miller *on Criminal Law,* sec. 54, pág. 165–66; Hall, *Principles of Criminal Law,* págs. 408–415.

Cuando se aprobó el párrafo 10, la Legislatura seguía la política establecida en dichos casos y estatutos. En vista de enmiendas posteriores, se habría evitado cualesquiera futuras dificultades si hubiera exceptuado expresamente en el párrafo 10 el asesinato en primer grado. Pero como nuestro Código Penal en dicha fecha disponía sustancialmente que sólo un delito sería castigable con muerte—asesinato en primer grado—la frase que empleó equivalía a decir asesinato en primer grado. No creemos que al eliminar la pena de muerte para asesinato en primer grado mediante la Ley núm. 42, Leyes de Puerto Rico, 1929 ((1) pág. 233), la Legislatura tuvo por miras hacer académica la excepción contenida en el párrafo 10. En efecto, el párrafo 10 prescribía cuando originalmente se aprobó que la coacción no es una defensa contra asesinato en primer grado. La Legislatura nunca ha enmendado el párrafo 10. Por tanto, todavía quiere decir que la coacción no es una defensa contra tal acusación.

■ Alega también el fiscal de este Tribunal que de cualquier modo la excepción del párrafo 10 no está envuelta aquí porque Galíndez no es un acusado. Pero la fórmula no es si tal testigo es de hecho un acusado, sino el que pueda ser

---

(¹) Véase el artículo 219 del Código Penal, Estatutos Revisados y Códigos de 1911, bajo el cual podía castigarse con pena de muerte el asaltar o descarrilar un ferrocarril.

acusado del crimen. Toda vez que Galíndez de conformidad con la excepción del párrafo 10 no podía alegar coacción si se le hubiera acusado junto a los dos acusados, por el delito de asesinato en primer grado, su declaración debe ser corroborada de acuerdo con el artículo 253, ya se le acuse o no. *Robinson* v. *State,* supra.

■ La corte de distrito cometió error al no instruir al jurado que, como cuestión de derecho, Galíndez era un cómplice, y su declaración tenía que ser corroborada antes de que pudiera declarase culpables a los acusados.

■ Alegan asimismo los apelantes que la corte inferior cometió error al declarar sin lugar su moción solicitando un veredicto de absolución por el fundamento de que en el réord no existe prueba corroborativa de la declaración de Galíndez. Esta alegación nos exige examinar parte de la prueba.

Galíndez declaró que fué con el finado, un soldado de nombre Ricardo N. Báez, a la casa de Tirado donde se celebraba un baile; que allí estuvieron durante dos horas; que Báez le pidió entonces permiso a Tirado para bailar; que Tirado se lo negó y él y Rodríguez tiraron a Báez al suelo; que Tirado le apretaba el cuello al soldado halándole la corbata mientras Rodríguez lo aguantaba; que el soldado pataleó durante cinco minutos y después se quedó quieto, cuando los acusados lo acostaron debajo de un árbol de mangó. El testigo ayudó a los acusados a llevarlo allí porque de haberse negado, éstos lo hubieren matado. Los dos acusados fueron entonces a buscar un bote en la orilla de la laguna, permaneciendo el testigo junto al soldado bajo el árbol de mangó; cuando los acusados regresaron, obligaron al testigo a ayudarlos a llevar a Báez a la orilla de la laguna a una yola con dos mechones encendidos; tiraron a Báez dentro de la yola; los dos acusados, pero no el testigo, se metieron en la yola en donde había además de los dos mechones, dos remos; los acusados remaron en dirección del Cam-

pamento Tortuguero; Rodríguez dijo, "Vamos a echarlo más arriba para que se acabe de ahogar"; Tirado asintió; el testigo los vió remar hacia el campamento; remaron 300 yardas, detuvieron el bote y tiraron el soldado a la Laguna Tortuguero.

Juana Rosario Andino, prima de Tirado, declaró que había una fiestecita en casa de Tirado, con Galíndez, Báez, Juan Rosario Sánchez, los dos acusados, y otras personas más; que Báez estaba en el balcón y que entonces Tirado lo agarró por la corbata y empezó a apretarle el cuello con la misma; que los dos acusados arrastraron al soldado al patio; que éste se defendió al principio y luego quedó inmóvil; que los dos acusados y otra persona más llevaron a Báez a un árbol de mangó y lo acostaron bajo el árbol; que se encontró con Rodríguez al día siguiente y él le dijo que no dijera nada de lo que había pasado la noche antes o de lo contrario se podía perjudicar.

En el contrainterrogatorio declaró que originalmente había sido arrestada por motivo de los hechos aquí envueltos y estuvo presa por un día; que prestó declaración ante la corte municipal en la misma forma que ahora declara porque quería salir de la cárcel; que algunas de las manifestaciones que le hizo al juez municipal eran ciertas y otras no. Entonces ella empezó a cambiar su historia, afirmando primero que había visto el suceso desde lejos, pero que no le prestó atención. Finalmente, dijo que nada había visto y que no estaba presente en la fiestecita. El fiscal, con el fin de impugnar su credibilidad en el contrainterrogatorio, introdujo en evidencia una declaración jurada suscrita por ella ante el juez municipal que era sustancialmente al mismo efecto de su declaración en el interrogatorio directo.

Juan Rosario Sánchez declaró que él no vió a los acusados y que no había estado en la casa de Tirado la noche del suceso. Para impugnar su credibilidad, el fiscal introdujo en evidencia sin objeción por parte de los acusados una

declaración jurada anterior suscrita por Rosario ante el juez municipal, que decía más o menos lo mismo que lo declarado por Galíndez y Juana Rosario Andino.

No es común y corriente que un testigo cambie su declaración mientras se encuentra en la silla testifical. Pero de ocurrir esto, como sucedió en el caso de Juana Rosario Andino, la parte que ofrece su declaración en el examen directo tiene derecho después de sentar las bases correspondientes, a impugnar su credibilidad en relación con lo manifestado por ella en el contrainterrogatorio, presentando su anterior declaración escrita, que es inconsistente con su declaración en el contrainterrogatorio. Véanse *Pueblo* v. *Méndez*, 54 D.P.R. 23; *Pueblo* v. *Lafontaine*, 43 D.P.R. 23; *Pueblo* v. *Pérez*, 43 D.P.R. 590; *Pueblo* v. *Cruz*, 62 D.P.R. 831; *Pueblo* v. *Lebrón*, 61 D.P.R. 657; *Pueblo* v. *Rodríguez*, 36 D.P.R. 427; *Hall* v. *Incorporated Town of Manson*, 68 N.W. 922 (Iowa, 1896); *People* v. *Reese*, 150 P.2d 571, 581 (Calif., 1944); *Herren* v. *State*, 276 S.W. 365 (Ark., 1925); *Ann. Cas.* 1914 B. 1120; *Annotations*, 74 A.L.R. 1042; 90 A.L.R. 74; 54 A.L.R. 1374; 117 A.L.R. 326; Ladd, *Impeachment of One's Own Witness—New Developments, 4 U. of Chi. L. Rev.* 69. *Cf. Annotation,* 140 A.L.R. 21. Mediante esta impugnación parcial el fiscal no atacaba todo su testimonio. La contención, que tenía derecho a hacer, fué que la testigo dijo la verdad en el examen directo pero mintió en el contrainterrogatorio. Tocaba entonces al jurado determinar si le daba crédito al examen directo o al contrainterrogatorio. En su consecuencia, no obstante algunas insinuaciones en contrario hechas por la corte inferior, en el récord hay alguna evidencia—la declaración de Juana Rosario en el examen directo—que, de ser creída por el jurado, era suficiente para corroborar la declaración de Galíndez. En su consecuencia, la corte de distrito no cometió error al declarar sin lugar la moción solicitando un veredicto de absolución.

■ Sin embargo, a pesar del hecho de que el récord contiene la evidencia corroborativa de Juana Rosario Andino en su examen directo, no podemos determinar si ésta fué creída por el jurado. En vista de las historias contradictorias de Juana Rosario mientras declaraba, el jurado puede haber basado su veredicto en el testimonio de Galíndez solamente, bajo la instrucción de la corte de distrito al efecto de que así podía hacerlo si decidía que Galíndez actuó bajo coacción. Pero, como hemos visto, Galíndez era un cómplice como cuestión de derecho, y por tanto el veredicto que pudo haberse basado en su testimonio solamente, no puede ser sostenido.

■ Los acusados también señalan como error el hecho de que mientras deliberaba el jurado, el márshal le notificó al juez de distrito, que estaba en cámara, que el jurado quería saber si podía rendir un veredicto de homicidio. El juez le dijo al márshal que informara al jurado que las únicas instrucciones que él les había dado fueron sobre asesinato en primero y segundo grados y de absolución.

Ésta fué una comunicación impropia héchale por el juez al jurado en ausencia de los acusados y de su abogado. Esta comunicación no se refería a la comodidad del jurado. *Pueblo* v. *Vázquez,* 68 D.P.R. 67; *Pueblo* v. *González,* 66 D.P.R. 903. Más bien fué una comunicación ''al jurado . . . de tal naturaleza que forma parte de los procedimientos en el caso''. *Pueblo* v. *Saldaña,* 66 D.P.R. 189, 191. El error de la corte ''es fatal, aunque el contenido de la comunicación no sea impropio . . . se presume perjudicial el error a menos que se pruebe afirmativamente que no ha habido perjuicio.'' Id., 191. Creemos que aquí no se ha demostrado afirmativamente esto. Aparte del hecho de que no podemos saber la manera en que el márshal le comunicó el mensaje del juez, no tenemos derecho a especular lo que hubiera ocurrido si este incidente hubiera tenido lugar en sala en presencia de los acusados y de su abogado.

Hay una manera sencilla por la cual los jueces de distrito podrán estar seguros de no infringir esta regla: el adoptar la práctica inflexible de no comunicarse con el jurado, no importa cuán frívolo sea el asunto, a no ser en corte abierta y en presencia del acusado y de su abogado, o después de haberles concedido amplia oportunidad de estar presentes.

*La sentencia de la corte de distrito será revocada y se devolverá el caso para la celebración de un nuevo juicio.*